## JOHNSON *v.* ATLANTIC, GULF AND WEST INDIA TRANSIT COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF FLORIDA.

No. 77. Argued November 14, 1894. — Decided March 4, 1895.

The road between Fernandina and Cedar Key was the road designated and pointed out in the various acts of the legislature of Florida referred to in the opinion, as the one on whose completion and after default the trustees were authorized to sell.

The Trustees of Internal Improvements in the State of Florida, who took possession of the railroad and sold it; were legally entitled to act as such trustees, on the well-settled doctrine that the acts of the several States, in their individual capacities and of their different departments of government — executive, judicial, and legislative — during the war, so far as they did not impair or tend to impair the supremacy of the National authority, or the just rights of citizens under the Constitution, are to be treated as valid and binding.

The weight of the evidence, apart from the evidential character of the answers, is clearly to the effect that the railroad, at the time of the sale, was in a thoroughly dilapidated condition, and, in view of its condition, and the state of the country, the price realized was not inadequate.

THIS was a suit in equity, brought for the purpose of subjecting certain railroad property, formerly in the possession of a corporation known as the Florida Railroad Company, to the effect of an alleged lien thereon of second mortgage bonds of that company, some of which bonds were held and owned, as averred, by the complainants. The various bills filed in the cause, upon which proceedings were had, were dismissed by the court below, and permission was denied certain of the complainants and others to file what was styled by them a bill of supplement, revivor, and amendment against the original defendants and others. The complainants were allowed an appeal to this court.

The Florida Railroad Company was a corporation organized under an act of assembly of the State of Florida, approved January 8, 1853. By this, the act of incorporation of the company, all persons who should become subscribers for stock thereof were enabled " to purchase, receive, retain, and enjoy to them and their successors and assigns, lands and tenements, goods and chattels, . . . and the same to grant, sell, mortgage, and dispose of," etc. The seventh section of the act provided that the company should have the right and privilege to construct and complete a railroad, to commence in East Florida, upon some tributary of the Atlantic Ocean, within the limits of the State of Florida, having a sufficient outlet to the ocean to admit of the passage of sea steamers, and thence to continue, in the most eligible direction, through the State, to some point, bay, arm, or tributary of the Gulf of Mexico, south and east of the Suwanee River, having a similar outlet, and that, so soon as practicable after the organization of the company, a competent engineer, under the direction of the president and directors, should proceed to locate the eastern terminus, and survey the route of said railroad to the southwestern terminus, and should make the proper estimates and the necessary charts and diagrams, which should be filed in the office of the company.

On January 6, 1855, an act of assembly of the State of Florida was approved, entitled " An act to provide for and encourage a liberal system of internal improvements in this State,"

c. 610, [No. 1] Acts of 1854–1855, page 9. The declared purpose of this act was to carry out a provision of the constitution of the State for the encouragement of internal improvements, making it the duty of the general assembly to ascertain by law proper objects of improvements in relation to roads, etc., and to provide for a suitable application of such funds as might be appropriated for such improvements. The first section of the act provided for the setting apart of certain lands granted to the State by the United States, and of the proceeds of the sales made and to be made thereof, as a fund to be called the internal improvement fund of the State of Florida, and provided that such lands and proceeds were to be strictly applied according to the requirements of the act. Other essential provisions of the act were as follows :

" SEC. 2. *Be it further enacted,* That for the purpose of assuring a proper application of said fund for the purposes herein declared, said lands and all the funds arising from the sale thereof, after paying the necessary expenses of selection, management and sale, are hereby irrevocably vested in five trustees, to wit, in the governor of this State, the comptroller of public accounts, the state treasurer, the attorney general, and the register of state lands, and their successors in office, to hold the same in trust for the uses and purposes hereinafter provided, . . . and to pay out of said fund, agreeably to the provisions of this act, the interest, from time to time, as it may become due on the bonds to be issued by the different railroad companies under authority of this act ; also, to receive and demand, semi-annually, the sum of one-half of one per cent (after each separate line of railroad is completed) on the entire amount of the bonds issued by said railroad company, and invest the same in stocks of the United States, or state securities, or in the bonds herein provided to be issued by said company. Said trustees shall also invest the surplus interest of said sinking fund investment as it may accrue. Said trustees shall also demand and receive from each railroad company named in this act the amount due to the internal improvement fund from said railroad company, according to the provisions herein con-

tained, on account of interest on the bonds issued by said company. . . .

"SEC. 3. *Be it further enacted*, That all bonds issued by any railroad company under the provisions of this act shall be recorded in the comptroller's office and so certified by the comptroller, and shall be countersigned by the state treasurer, and shall contain a certificate on the part of the trustees of the internal improvement fund that said bonds are issued agreeably to the provisions of this act, and that the internal improvement fund, for which they are trustees, is pledged to pay the interest as it may become due on said bonds.. All bonds issued by any railroad company under the provisions of this act shall be a first lien or mortgage on the roadbed, iron, equipment, workshops, depots, and franchises; and upon a failure on the part of any railroad company accepting the provisions of this act to provide the interest as herein provided on the bonds issued by said company, and the sum of one per cent per annum as a sinking fund, as herein provided, it shall be the duty of the trustees, after the expiration of thirty days from said default or refusal, to take possession of said railroad and all its property of every kind and advertise the same for sale at public auction to the highest bidder, either for cash or additional approved security, as they may think most advantageous for the interest of the internal improvement fund and the bondholders. The proceeds arising from such sale shall be applied by said trustees to the purchase and cancelling of the outstanding bonds issued by said defaulting company, or incorporated with the sinking fund: *Provided*, That in making such sale it shall be conditioned that the purchasers shall be bound to continue the payment of one-half of one per cent semi-annually to the sinking fund until all the outstanding bonds are discharged, under the penalty of an annulment of the contract of purchase, and the forfeiture of the purchase money paid in.

"SEC. 4. *Be it further enacted*, That a line of railroad from the St. John's River, at Jacksonville, and the waters of Pensacola Bay, with an extension from suitable points on

said line to St. Mark's River, or Crooked River, at White Bluff on Apalachicola Bay, in Middle Florida, and to the waters of St. Andrew's Bay, in West Florida, and a line from Amelia Island, on the Atlantic, to the waters of Tampa Bay, in South Florida, with an extension to Cedar Key, in East Florida; also a canal from the waters of St. John's River on Lake Harney to the waters of Indian River, are proper improvements to be aided from the internal improvement fund, in manner as hereinafter provided.

" SEC. 5. *Be it further enacted*, That the several railroads now organized or chartered by the legislature, or that may hereafter be chartered, any portion of whose routes as authorized by their different charters, and amendments thereto, shall be within the line or routes laid down in section four, shall have the right and privilege of constructing that part of the line embraced by their charter on giving notice to the trustees of the internal improvement fund of their full acceptance of the provisions of this act, specifying the part of the route they propose to construct; and upon the refusal or neglect of any railroad company now organized to accept, within six months from the passage of this act, the provisions of the same, any other company, duly authorized by law, may undertake the construction of such part of the line as they may desire to make, and which may not be in progress of construction under a previous charter.

·   *          *          *          *          *

" SEC. 8. *Be it further enacted*, That on the completion of the grading and the furnishing of the cross-ties of twenty miles continuously, and every additional ten miles, as provided by this act, said railroad company are hereby authorized to issue coupon bonds, having not more than thirty-five years to run, and drawing not more than seven per cent annual interest, payable semi-annually in the city of New York or Tallahassee, at the option of the purchaser, at the rate of eight thousand dollars per mile for the purchase and delivery of the iron rail, spikes, plates, and chairs, and after the rail has been laid down on the line, the additional sum of two thousand dollars per mile for the purchase of the necessary equipments; and said

bonds shall always afterwards constitute and be a first lien or mortgage upon the roadbed, iron, equipment, workshops, depots, and franchises.

*    *    *    *    *

"SEC. 11. *Be it further enacted*, That it shall be the duty of the president and directors of every railroad company accepting the provisions of this act, while the road is under construction, to report to the trustees of the internal improvement fund every six months, under the oath of the president and at least two of the directors, the gross receipts of said company from the traffic of the road for the past six months, the cost of transportation and repairs, and the total amount of the net receipts of said company; and it shall be the duty of the president and directors to pay to the trustees of the internal improvement fund fifty per cent of said net receipts every six months, which sum or sums shall be applied by the trustees of the internal improvement fund toward the payment of the interest of any bonds issued by said company.

"SEC. 12. *Be it further enacted*, That every railroad company accepting the provisions of this act shall, after the completion of the road, pay to the trustees of the internal improvement fund at least one-half of one per cent on the amount of indebtedness or bond account every six months as a sinking fund, to be invested by them in the class of securities named in section two, or to be applied to the purchase of the outstanding bonds of the company; but it shall be distinctly understood that the purchase of said bonds shall not relieve the company from paying the interest on the same, they being held by the trustees as an investment on account of the sinking fund.

*    *    *    *    *

"SEC. 14. *Be it further enacted*, That for all payments made by the trustees of the internal improvement fund on account of interest for any railroad company agreeably to the provisions of this act, said trustees shall demand and receive from said railroad company equal amounts of the capital stock of said company, which stock shall entitle the internal improvement fund to all the privileges and advantages of private stockholders."

On March 6, 1855, D. L. Yulee, president of the Floric Railroad Company, wrote to the president of the board o trustees of the internal improvement fund as follows:

"SIR: By instruction of the board of directors of the Fla. R. R. Co. I beg leave to inform the board of trustees of the int. imp. fund that the company make full acceptance of the terms and provisions of the act passed at the late session of the general assembly relative to a system of internal improvements in the State.

"I beg leave to say that they propose to construct a road from Amelia Island in the direction of Tampa, as far as a point proper for divergence, to Cedar Keys, and from said diverging point to Cedar Keys, by way of extension; and that if the amendment to the charter of the company, now pending in the general assembly, is granted, they will also construct the balance of the road from the diverging point to Tampa."

An act to amend the act incorporating the Florida Railroad Company was approved on December 14, 1855. Acts of 1855, 16, c. 729 [No. 120]. It contained, among other provisions, the following: "SEC. 1. That the act incorporating the Florida Railroad Company, approved the 8th day of January, A.D. 1853, is hereby amended so that the said company shall have power to construct the railroad from Amelia Island on the Atlantic to the waters of Tampa Bay in South Florida, with an extension to Cedar Key in East Florida, under the provisions of an act to provide for and encourage a liberal system of internal improvements in this State, approved the 6th day of January, A.D. 1855. . . . SEC. 4. That the president and directors of the Florida Railroad Company may set off any portion of their line to persons desirous of constructing the same, and in that event such portion may have a distinct organization, with all the grants, rights, powers, duties, and privileges conferred on the Florida Railroad Company, with the right to adopt a different name, in order to keep the stock account and liabilities separate: *Provided*, That two months' notice shall be given to the board of trustees of the internal improvement fund of such set-off or assignment, and a copy of the same be filed with said board of trustees."

Subsequently to the approval of this act the following letter was written:

"TALLAHASSEE, December 6, 1858.

" *To the Trustees of the Internal Improvement Fund.*

"GENTLEMEN: Doubts having been expressed as to the sufficiency of the notices heretofore given as to the efficacy of the terms of the first section of the act of December, 1855, amending the charter of the Florida Railroad Company in placing the part of the route between the Cedar Keys and Tampa Junction within the provisions of the internal improvement act without any special notice, I hereby and now, to put at rest any future doubts, formally notify the trustees of the full acceptance by the Florida Railroad Company of the provisions of the act of January 6, 1855, entitled ' An act to provide for and encourage a liberal system of internal improvements ' for that part of the route designated in their amended charter which lies between Tampa and the point of junction with the Cedar Keys extension; or, in other words, for all that part of the routes covered by their charter which may not be regarded by the trustees to be included in the effect of the notice filed by them of the date of March 6, 1855.

"I have the honor to be, respectfully yours,

"D. L. YULEE,
" *President of the Florida Railroad.*"

Both this letter and that dated March 6, 1855, were certified by the commissioner of lands and immigration of the State of Florida on April 7, 1882, to be on file in his office.

In accordance with the provisions of the internal improvement act, part or all the first mortgage bonds authorized thereby were issued, and the company also issued second mortgage bonds, which were made a lien on the railroad property, inferior to that of the first mortgage bonds, but a first lien on the company's lands within the town sites of Fernandina and Cedar Key, and on other lands of the company along the line of the road. To secure the payment of the principal and interest of the second mortgage bonds all the property of

the company was conveyed by it, in the year 1856, to James F. Soutter and John McRae, in trust.

The road was completed between Fernandina and Cedar Key in March, 1861, and, as appears by the testimony of Yulee, a separate contract was made on August 20, 1858, for the construction of a portion of that part of road which extended from Waldo, a point on the line between Fernandina and Cedar Key, to Tampa Bay.

On November 3, 1866, the trustees of the internal improvement fund conveyed to "Edward N. Dickerson and his associates" all the railroad property of the said company by an indenture which stated in its recitals the provisions of the third section of the internal improvement act, and also that the Florida Railroad Company had entirely failed since November 5, 1863, to pay the one-half of one per cent semi-annually on the bonds issued by it according to the provisions of the internal improvement act, and also the interest on the same; that, according to the provisions of the third section of that act, the trustees of the internal improvement fund on October 6, 1866, took into their possession the railroad and all its property of every kind, and advertised the same for sale for cash at public auction, at the town of Gainesville, Florida, on November 1, 1866; that on the day and place last mentioned the terms of the sale were announced, namely, that the sale and the rights of the purchaser at the same were subject to all the conditions of the internal improvement act; that the railroad and all its property of every kind was then and there put up for sale, and was purchased by Isaac K. Roberts, he being the highest and best bidder, having bid the sum of $323,400 for the same, and that the said Isaac K. Roberts had directed that the railroad and all the property thereof should be conveyed to Edward N. Dickerson and associates.

Immediately upon the making of this conveyance the purchasers of the said property organized themselves into a new company, which they called the Florida Railroad Company. On May 12, 1869, they issued bonds aggregating in amount $2,300,000, bearing interest at the rate of seven per cent per annum, maturing January 1, 1900, and, to secure the payment

of the principal and interest of the same, on May 26, 1869, they made a conveyance of the railroad property, in trust, to John A. Stewart and Frederic A. Conkling.

Afterwards the said purchasers formed a new corporation, having the name of the Florida Railroad Company, under the provisions of an act of assembly approved June 24, 1869, entitled " An act to perfect the public works in this State," which provided, in the 29th section thereof, as follows: " That in all cases of seizure and sale of the railroad property and franchises of any company by the trustees of the internal improvement fund under the provisions of the act to provide for and encourage a liberal system of internal improvement, the purchaser or purchasers shall be entitled to do whatever acts may be necessary to enable him or them to exercise and enjoy the franchises granted by the charter of incorporation under the provisions of the said original charter and the amendments thereto." Laws of 1869, Extra Session, c. 1716 [No. 4].

By an act approved January 18, 1872, it was provided that the corporate company owning the property formerly known as the Florida railroad, and which had theretofore been known as the Florida Railroad Company, should thereafter be known as the Atlantic, Gulf and West India Transit Company, and the rights, franchises, and privileges, as well as the duties, responsibilities, and liabilities of the said corporation, should in all respects remain and continue the same as though no change had been made in their said name. Laws of 1872, c. 1918 [No. 56].

On August 21, 1873, Robert H. Johnson, a citizen of the State of New York, brought his bill in equity in the Circuit Court of the United States for the Northern District of Florida against the said Atlantic, Gulf and West India Transit Company; John McRae, as trustee, appointed by the Florida Railroad Company, for the benefit of the holders of second mortgage bonds thereof, a citizen of the State of North Carolina; Marshall O. Roberts and Edward N. Dickerson, of the State of New York; Isaac K. Roberts, a citizen of the State of Louisiana; Samuel A. Swann, a citizen of the State of Florida; David L. Yulee, of Florida, and the Florida Railroad

Company, in which bill the complainant alleged that he was the holder and owner of two second mortgage bonds of $1000 each of the Florida Railroad Company, dated March 1, 1856, payable March 1, 1891; that these bonds were a second mortgage on the Florida railroad, and on property pretended to belong to the Atlantic, Gulf and West India Transit Company; that by the terms of the bonds the trustees named therein were empowered to sell or otherwise dispose of the said property, without judicial proceeding, for the benefit of the holders of the bonds in default of the payment of the principal or interest thereof to an amount equal to one year's interest; that there was then due on the bonds held by the complainant all of the principal and $1760 of interest, amounting in all to $3760, being in amount more than one year's interest; that by reason of default of payment of interest the principal had become demandable of the company, and that for the payment of the same all the said railroad property had become liable.

The complainant then referred to the issue of the first mortgage bonds under the internal improvement act, and averred that the railroad had never been completed; that by the terms of its charter its main track was to be extended to Tampa Bay; that this main track had never been built, and that the net earnings of the road had never at any time exceeded six per cent. of the capital stock, bonded debt, and sinking fund. It was alleged, therefore, that the interest due on such of the first mortgage bonds as might be outstanding was demandable of the internal improvement fund, and was not a charge upon the company or the road. The complainant claimed that if, however, it should be decreed that such interest was payable by the company, he was entitled to pay such interest and redeem the road.

The complainant stated that Soutter, one of the trustees for the benefit of the second mortgage bondholders, was not living, and averred that McRae, the other trustee, had neglected and refused to execute the powers of his trust for the benefit of the bondholders, and had suffered a large quantity of the lands conveyed to him for the purposes of the trust to

be fraudulently and collusively sold for the benefit of the defendant, David L. Yulee, and the Atlantic, Gulf and West India Transit Company. He averred that the railroad was of great value, and worth much more than enough to pay the whole amount of the outstanding bonds and other debts of the company; that the original Florida Railroad Company was identical with the Atlantic, Gulf and West India Transit Company, subject to the same trusts and liabilities, and composed in part, if not altogether, of the same persons, and that the companies were in privity of estate and of person; that the change of name had been made in guile and covin and with intent to defraud the creditors of the Florida Railroad Company; that the stockholders of that company, except the trustees of the internal improvement fund, and except such stockholders as had accepted stock in payment of debts due them for aiding in the construction of the road, were credit stockholders who had subscribed for stock chiefly in large amounts, and had paid only a small assessment thereon; that the majority of the stock was held in this manner by persons who had paid merely nominal sums thereon; that David L. Yulee was the president of the Florida Railroad Company, and had controlled, either in his own name or through Dickerson and associates, a majority of the shares of the capital stock of the company; and that the cost of construction of the railroad was paid almost entirely, if not altogether, out of moneys and credits resulting from negotiations of the first mortgage bonds and the sale of the second mortgage bonds.

It was further stated that the associates of Dickerson were unknown to the complainant, but the complainant stated that he was informed and believed that such associates included Yulee, and he prayed for a discovery from Yulee of the names of all such associates and of the terms and manner of their association.

Other allegations of the bill were as follows: That in 1866, within six months after the establishment of the so-called provisional government of the State of Florida, Yulee, then president of the Florida Railroad Company, effected an arrangement by which the defendant, Marshall O. Roberts advanced the money to Yulee and Dickerson and associates

to purchase the first mortgage bonds of the company then outstanding, at about 20 per cent of their face value, for the benefit of Yulee and Dickerson and associates; that these bonds were so purchased by Yulee or by Dickerson and associates, or by Roberts for them, under an agreement that the railroad should be sold for the interest then accrued upon the bonds, and be bought in by Yulee and Dickerson and associates and be held by them to the exclusion of the internal improvement fund and its interest in the capital stock of the company, and be divested of the trusts and liens theretofore created, and be freed from the debts and obligations due the complainant and the creditors of the company; that Yulee, president of the company, procured an order from the alleged governor and other officers of the pretended provisional government of Florida, claiming to be trustees of the internal improvement fund, for the seizure and sale of the railroad for the satisfaction of the one per cent per annum due the sinking fund; that Yulee, president as aforesaid, agreed to pay in at such sale the majority of the outstanding first mortgage bonds, and further agreed with the said trustees to guarantee that the railroad should be purchased at the sale for an amount sufficient to pay 20 per cent of the first mortgage bonds; that in pursuance of that agreement the railroad was seized and sold by the trustees, and was bid in by Isaac K. Roberts for the benefit of Edward N. Dickerson and associates for the sum of $314,000, of which all but about $96,000 was paid in the said first mortgage bonds; that the trustees, under an agreement negotiated by Yulee, also transferred to him and Dickerson and associates not less than 100,000 acres of public lands belonging to the said fund in payment of interest accrued on the first mortgage bonds, for the debt of which bonds Yulee and Dickerson and associates were liable as stockholders of the company; that thus the trustees not only received those bonds and cancelled them, in violation of law, before their principal had become due, but likewise conveyed the land to Yulee and Dickerson and associates on the pretence that the interest of the same was due and demandable of them, the said trustees, and was a charge upon the said fund, and

then really paid to Yulee and Dickerson and associates representing the company a large and valuable consideration for paying their own or the company's debt; that since the alleged purchase of the road Yulee and Dickerson and associates had continued in the possession, management, and ownership of the railroad as before, and that Yulee had directed its affairs and received its funds; that at the time of the sale the iron rails on the road were worth in cash a sum greater than the purchase money paid for the road, and that all the property of the company was then, at the time of the sale, worth not less than $1,000,000; that the internal improvement trust was a public trust, and that Yulee and Dickerson and associates had express notice thereof; that it was pretended by Yulee and Dickerson and associates that the road was seized and sold by the trustees because of the inability and failure of the company to pay the one per cent per annum due the sinking fund, when, in reality, the company was able to pay the same, and its failure so to do was the act and default of the persons who controlled it and who procured its seizure and sale in the interest of Yulee and Dickerson and associates; that the persons pretending to be governor, comptroller, treasurer, attorney general, and register of state lands, and, as such officers, trustees of the said fund, were without authority as such trustees; that such persons, having been placed in office under an unconstitutional exercise of power by the President of the United States, were without lawful authority to exercise the functions of their respective offices; that, therefore, the seizure and sale of the railroad as aforesaid were not only an intrusion and a trespass, but that such sale and the said purchase were absolutely void; that all that was paid by Yulee and his associates for the railroad at the sale thereof was a check for $26,000 and about $1,000,000 of first mortgage bonds, the principal of which was not due until 1892, which bonds were bought either by or for Yulee and his associates at about 20 per cent of their face value; that those bonds, at the time they were procured to be sold and bought by Yulee and his associates for the purpose of obtaining the said sale, had not been sold in the

manner required by law, but had been hypothecated by the company to effect a loan of money and to secure the repayment of the same, and were subject to hypothecation at the time they were so purchased; and that the holders of the bonds were not then demanding payment of the same, but were induced to sell them by the representations of Yulee, which the complainant believed to be untrue and to have been made with fraudulent intent, that the road could not be put in running order after the injuries it had sustained during the war without an advance of capital by the holders of the bonds, and that it was not then in condition to pay operating expenses.

The prayers of the bill were that the court might decree that the second mortgage bonds held by the complainant constituted a lien on the property of the Florida Railroad Company; that the complainant had a right to enter upon the property and sell or otherwise dispose of the same for the payment of the principal and interest of his bonds; that inasmuch as the trustees of those bonds had failed and refused to perform their duties, the powers confided to them should be executed by the court; that the sale made by the trustees of the internal improvement fund was without authority and absolutely null and void, and in no way affected the complainant's right to have the property disposed of for the satisfaction of the said second mortgage bonds; that the persons who pretended to act as governor, comptroller, treasurer, attorney general, and register of state lands, and, as such, to be trustees of the internal improvement fund, did not hold such offices, in law, and therefore that the pretended sale by them of the road was void; that if such sale of the property was valid for any purpose, the purchase thereof inured to the benefit of the stockholders, bondholders, and other creditors of the company, and of the internal improvement fund; that at the time of the sale the railroad was not a completed road within the meaning of the internal improvement act, and therefore that the interest which had then accrued on the first mortgage bonds was not a charge upon the railroad, and that the same was not liable, under the provisions of the said act, to seizure and sale; that, either in the event that such interest should be

decided by the court to be payable out of the said fund, or in the event that it should be decided to be a charge upon the railroad, the complainant had a right to pay the interest due on the outstanding first mortgage bonds, and to redeem the road for the satisfaction of his demands; that the said companies be foreclosed of all equity of redemption in the property; and that the same be sold for the payment of the complainant's bonds, subject to the lien of the principal of the first mortgage bonds.

The complainant further prayed for an injunction to restrain the defendant company and others from receiving the income of the road and directing the business of the same, and for the appointment of a receiver to collect such income and to manage the business of the road under the orders of the court.

September 11, 1873, the said complainant filed an amended bill, making George H. Dawson, executor of William Phelan, deceased, a party defendant, showing that Phelan had been the holder of certain bonds of the Florida Railroad Company, known as the southern section bonds, and asserting that the lien of the same upon the said property was inferior to that of the bonds held by the complainant.

On the same day Mark A. Knowlden, stating himself to be an executor of the said William Phelan, deceased, filed a cross-bill relating to the same southern section bonds described in the complainant Johnson's amended bill, which bonds, as alleged, were secured by a deed of trust on the portion of the Florida railroad between Waldo and Tampa. Upon this bill no proceedings appear to have been had.

The defendant Dickerson did not put in an answer to the complainant's bill, but on September 26, 1873, he filed an affidavit containing, among other things, the following statement: "At the time of the purchase the road was entirely destroyed for many miles, the iron being removed to other roads and States, and the whole wood superstructure was decayed or destroyed and worthless. There were very few cars on the road, and the few that were there were entirely worthless, and not one of them is now in existence. The purchasers rebuilt the road, purchased an entirely new rolling stock, built

and furnished with new machinery the workshops and other needed buildings, there being none at either end of the road, and set the road in operation. In doing this the purchasers have expended more than five hundred thousand dollars more than the road has received by way of earnings from all sources whatever, and not one dollar has been repaid to any of the parties whose money has been expended in this work." He further stated that from the time of the purchase of the road to the filing of the complainants' bill no demand was ever made by the complainants in the case, or by any one, upon the owners of the road for payment of the second mortgage bonds, and that he never thought, or heard it suggested, that any such claim would be made; that the deed of trust to Stewart and Conkling, executed by the purchasers of the road, was duly recorded in every county in Florida in which the road existed, and that those trustees had endorsed a large number of bonds, which were sold to various *bona fide* holders, and which were then outstanding, secured by the said deed of trust. He further stated that the road was in the possession of the company defendant and not of Yulee, the vice-president of the company, or of any other person.

On the same day Yulee filed an affidavit, in which he denied the essential allegations of the complainant's bill. He afterwards embodied the substance of his affidavit in his answer.

On September 27, 1873, the case was considered by Bradley, Circuit Justice, as to the complainant's motion for an injunction and the appointment of a receiver of the road, and the motion was denied.

The Atlantic, Gulf and West India Transit Company filed its answer on November 3, 1873, in which it denied, on information and belief, all the allegations of the bill which charged the Florida Railroad Company, the trustees of the internal improvement fund, and others with fraud, and denied that they had done any act in fraud of the complainant or any other bondholder or creditor of the Florida Railroad Company. The said defendant company averred that until the bill was filed it never heard that any of the bond-

holders claimed that it was indebted to them, or that it held the property subject to the lien of the bonds, although the holders of almost all of the bonds had been in communication with the defendants. It further averred that the road was in its possession exclusively, and not in the possession or control of Yulee or any other person, and that Yulee had no authority over the road, except such as he derived from the company as one of its officers.

John McRae, surviving trustee of the second mortgage bonds, in his answer filed July 22, 1874, denied, in answer to the allegations of the bill, that he had neglected and refused to resist the sale of the road, or to have it set aside as fraudulent; and averred that until he saw such allegations he never heard it intimated or suggested, to the best of his recollection, that there was any fraud or irregularity in the sale by the trustees of the internal improvement fund, and that, therefore, the charge that he refused to interfere concerning the sale was untrue.

The answer of David L. Yulee was filed December 3, 1874. This defendant referred to the fifth section of the internal improvement act, and stated that, as the road of the Florida Railroad Company authorized by its charter, and determined upon by a competent engineer and by the directors of the company, was upon the route from Amelia Island to Cedar Key, in the direction of Tampa Bay, the company gave notice to the trustees of the internal improvement fund of its full acceptance of the provisions of the act, and specified the line from Amelia Island to Cedar Key as the part of the road which it proposed to construct; that soon after such notification it entered into a contract for the construction of this portion of the road, in which contract it was stipulated that the contractors should receive the bonds which were to be issued under the said act; that all the bonds authorized by the act were issued; that under the said contract the road from Amelia Island to Cedar Key was built; that the object of the act amending the company's charter was to enable it to construct the remainder of the line to Tampa, which it designed to do as soon as it had completed the line to Cedar

Key and was able to provide the means necessary for the work; that upon the completion of the road from Amelia Island to Cedar Key the said trustees regarded it as a completed road under the said act and under the charter of the company; that the company was liable thereafter for the sinking fund charges and interest; and that the company, believing that such were its obligations, paid several instalments of sinking fund charges, and also a due proportion of its net earnings, as required by law, down to August, 1864, as the defendant believed.

The defendant Yulee then described the dilapidated and impoverished condition of the road, caused by the interruption of business brought about by the war, and the great injury done the road by acts of the opposing armies, and averred that he used every means in his power to comply with the requirements of the internal improvement act and to prevent the sale of the road which he feared would be necessary. He denied that he procured an order for the sale; that he agreed with the trustees that the road should be purchased for an amount sufficient to pay 20 per cent of the outstanding first mortgage bonds; that the failure to make payment to the sinking fund was with intent to procure the seizure of the road and its purchase by Dickerson and associates, and he averred that, on the contrary, the sale of the road was caused by its wrecked condition, and the failure of the company to obtain means to extricate itself from the situation in which it was left by the war. He denied that any of the first mortgage bonds were unissued and held in hypothecation for the company, or that any of such bonds were used for any other purposes than those contemplated by law, and averred that all of the said bonds were issued by the company, under its contract for the building of the road, in payment for the bridges and other structures crossing the marshes and waters of Amelia River, and for iron and equipments put on the railroad. He denied, further, that the defendant company was identical with the original Florida Railroad Company, or was in any way connected with the transactions or obligations of the same; that lands conveyed to Soutter and McRae,

trustees, had been suffered by McRae to be fraudulently and collusively sold for the benefit of the defendant Yulee; that the property on the road was worth at the time of the sale $1,000,000, or even, in cash, the sum of $323,000, for which it was sold; and denied that he was one of the persons included in the designation Edward N. Dickerson and associates.

On March 17, 1877, W. W. Corcoran was made a party defendant, and on the 2d of the following month he filed his bill, alleging his ownership of certain of the second mortgage bonds of the Florida Railroad Company, the principal of which was due on March 1, 1877, and upon which interest was due from March 1, 1860. He stated that he adopted all of the statements and allegations of the original bill filed by Johnson, and asked that he might be admitted to share in the relief therein prayed.

John H. Stewart and Frederick Conkling, trustees named in the deed of trust executed for the benefit of the holders of bonds issued by the purchasers at the said sale of the railroad property, were made parties defendant on October 16, 1877, and on the following day they filed their answer, which was devoted mainly to showing that it would be inequitable for the complainants to profit by their own laches, and to enjoy the advantages derived from the sale of the bonds to secure which the said deed of trust was made to the respondents, and thus to deprive the innocent holders of those bonds of the security upon which the loan was made.

These parties also filed a cross-bill, on October 17, 1877, averring therein that they had accepted their trust in good faith, and without notice of any pretended claim on the property by the complainant in the original bill; that the bonds issued by the purchasers of the road were issued properly; and that the value thereof was greatly impaired by the pretended lien of the said second mortgage bondholders. They therefore prayed for a decree that the deed of trust to them was a valid conveyance; that the holders of the second mortgage bonds be required to resort to lands in the hands of the said McRae, trustee; that the suit be dismissed; and that the complainants Johnson and Corcoran be enjoined from seeking

to enforce their pretended lien. Upon this cross-bill no subpœna was issued nor proceedings had.

The Atlantic, Gulf and West India Transit Company, on August 29, 1877, filed its answer to Corcoran's bill, in which answer, among other things, it set out that Corcoran was fully informed of all the essential transactions at the time they were made, upon which the claims of himself and Johnson were based, and had chosen to sleep upon his rights, and stated that, therefore, Corcoran ought not to be permitted, after a silence of about ten years, to come into court with charges of fraud against the participants in those transactions.

Replications were duly made to all of the said answers, and the taking of testimony was begun on November 8, 1877.

On June 13, 1883, Bella A. Johnson, executrix of Robert H. Johnson, deceased, W. W. Corcoran, and others presented to the said court a bill styled by them a bill of supplement, revivor, and amendment, seeking to bring in additional plaintiffs and defendants, and setting up matters which, as the complainants averred, had only come to their knowledge since the filing of their said bills, namely, that on November 10, 1879, there was submitted to the Secretary of the Interior of the United States by the Florida Railroad Company, attempting to secure the advantages of certain laws relative to government land grants to certain railroads, a map, and evidence showing that a map of definite location of the company's road from Waldo to Tampa had been filed in the Secretary's office by the company on December 14, 1860, (which map had been lost,) and that the map last presented was a duplicate of the original map; that thereupon the Secretary of the Interior had approved the map and the original location and survey, and had directed that the necessary withdrawal of United States lands be made to secure the proper adjustment of the grant along the original line of the road; that this withdrawal was made on March 26, 1881. It was alleged that the company, having performed within the proper time such work on the road between Waldo and Tampa as was required by the internal improvement act, became entitled to land along the road: that therefore the trustees of the second mortgage bonds

became entitled to such land, and to hold the same for the benefit of the holders of those bonds, and subject to the lien thereof; that on March 1, 1859, the Florida Railroad Company issued other bonds, known as southern extension bonds, attempted to be secured by a deed of trust executed to James E. Broome, who was succeeded as trustee by S. A. Swann; that such bonds were inferior to the said second mortgage bonds, which constituted a first lien on the constructed portion of the road between Waldo and Tampa, on the franchise necessary for its operation, and on all the land granted or to be granted by the United States in aid of the construction of the road. Relief was asked appropriate to these allegations. Leave to file this bill was denied by the court.

On December 7, 1887, after a hearing upon the bills, answers, and evidence, the bills of the complainants were dismissed. The case was then brought here on appeal.

*Mr. George F. Curtis, Mr. Wilkinson Call*, and *Mr. A. H. Garland* for appellants. *Mr. Heber J. May* was on their brief.

*Mr. A. H. Wintersteen*, (with whom was *Mr. John A. Henderson* on the brief,) for appellees.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

On the 21st day of August, 1873, Robert H. Johnson, a citizen of the State of New York, filed, in the Circuit Court of the United States for the Northern District of Florida, a bill of complaint against the Atlantic, Gulf and West India Transit Company, a corporation of the State of Florida, the Florida Railroad Company, and other persons.

The complainant alleged that he was the owner of two bonds of one thousand dollars each, made by the Florida Railroad Company, dated March 1, 1856, payable on March 1, 1891, and secured by a second mortgage on the railroad, franchises, and property of said company, and which bonds, with interest thereon, were due and unpaid.

The object of the bill was to set aside and have declared

null and void a sale of the property and franchises of the Florida Railroad Company, made on November 1, 1866, by the trustees of the internal improvement fund, in pursuance of the provisions of the acts of assembly under which the company was incorporated, and possessed its rights and property. It appears that after said sale a deed, bearing date November 3, 1866, was executed and delivered by the trustees to Edward N. Dickerson and his associates representing the purchasers at the sale, and that subsequently the purchasers organized themselves into a new corporation by the name of the Florida Railroad Company. . This new company was reorganized January 1, 1870, under authority of an act of the legislature of Florida of June 24, 1869, and afterwards, by an act of assembly dated January 18, 1872, its name was changed to that of the Atlantic, Gulf and West India Transit Company.

As already stated, the original bill of Robert H. Johnson was filed August 21, 1873 — almost seven years after the sale. W. W. Corcoran filed an intervening bill alleging ownership of some of the second mortgage bonds on April 2, 1877. In 1883, Bella A. Johnson, as executrix of Robert H. Johnson, deceased, W. W. Corcoran, and some new parties applied for leave to file a supplementary bill, which was refused by the court. In February, 1886, Karrick V. Z. Riggs, Francis B. Riggs, and William C. Riggs, of New York, filed intervening petitions, alleging ownership of second mortgage bonds, and praying to be admitted as parties entitled to share in the relief prayed for.

On December 7, 1887, after final hearing, a decree was filed dismissing the bills. On November 6, 1889, an appeal was allowed to this court.

The principal grounds for relief stated in the bill were illegality in the form and manner of the sale and fraud and collusion between Dickerson, Yulee, and others, the purchasers, sufficient to vitiate the sale, even if it were valid in form. The charge of illegality in the sale of the railroad is based on two particulars — first, that the power of sale given to the trustees of the internal improvement fund in the act approved January 6, 1855, entitled "An act to provide for and encour-

age a liberal system of internal improvements in this State," did not authorize a sale, even in event of a default, until after the completion of the railroad in question, and that the said railroad was not completed at the time of the sale; and, secondly, because the persons who officiated as such trustees and made the sale were not lawfully constituted officers of the State, and their action was consequently null and void.

The original company was incorporated by an act approved January 8, 1853, entitled "An act to incorporate a company to construct a railroad across the peninsula of Florida, under the style of the Florida Railroad Company." The route of the railroad was thus designated in the second section of the act : " That the said railroad shall commence in East Florida, upon some tributary of the Atlantic Ocean, within the limits of the State of Florida, having a sufficient outlet to the ocean to admit of the passage of sea steamers, and shall run through the eastern and southern part of the State in the most eligible direction to some point, bay, arm, or tributary of the Gulf of Mexico in South Florida, south of the Suwanee River, having a sufficient outlet for sea steamers, to be determined by a competent engineer, with the approval of a majority of the directors of the said company." Under this proviso a route was selected beginning at Fernandina on Amelia Island, and terminating at Cedar Key, being on a bay of the Gulf of Mexico and south of the Suwanee River.

Afterwards the general improvement act of January 6, 1855, was passed, in the fourth section of which were enumerated certain lines of railroad as proper improvements to be aided in manner provided in said law, and among them "a line from Amelia Island on the Atlantic to the waters of Tampa Bay, in South Florida, with an extension to Cedar Key." The fifth section of the act provided that the several railroad companies then organized or chartered by the legislature, or that might thereafter be chartered, any portion of whose routes, as authorized by their different charters and amendments, should be within the lines or routes laid down in section four, should have the right and privilege of constructing that part of the line embraced by their charter, on giving notice to the trustees

of the internal improvement fund of their full acceptance of
the provisions of said act, specifying the part of the route they
proposed to construct.   The Florida Railroad Company, it is
undeniably shown, gave such notice of acceptance, specifying
the line from Amelia Island to Cedar Key as the part of the
route which it proposed to construct; and, on June 11, 1855,
entered into a contract with Joseph Finegan & Company,
whereby the latter agreed to construct a railroad from Fer-
nandina, on Amelia Island, to Cedar Key, in all respects con-
formable to the requirements of the general improvement act
of January 6, 1855.

Afterwards, in December, 1855, the legislature authorized
the Florida Railroad Company to " construct the railroad from
Amelia Island, on the Atlantic, to the waters of Tampa Bay,
in South Florida, with an extension to Cedar Key, in East
Florida, under the provisions of the act approved January 6,
1855."

The line between Amelia Island and Cedar Key was com-
pleted in 1861.

The general improvement act of January 6, 1855, authorized
companies accepting its provisions to issue first mortgage bonds
at the rate of $10,000 per mile, which bonds were to be coun-
tersigned by the state treasurer and the trustees.   It was fur-
ther provided that the railroad company should pay to the
trustees of the improvement fund fifty per cent of its net re-
ceipts every six months, to be applied by the trustees towards
the payment of the interest on the bonds of the company, and
should further pay, after the completion of the road, to the
trustees at least one-half of one per cent on the amount of
indebtedness or bond account as a sinking fund.

Upon the failure of any railroad company accepting the pro-
visions of the act to provide interest on the bonds issued by it
and the percentage for the sinking fund, it was made the duty
of the trustees, after the expiration of thirty days from said
default or refusal, to take possession of said railroad and all its
property and to advertise the same for sale at public auction
to the highest bidder, either for cash or approved security, as
they might think most advantageous, the proceeds to be ap-

plied to the purchase and cancelling of outstanding bonds, but the purchasers of the road to be bound to continue the payment of one per cent into the sinking fund until all the outstanding bonds should be discharged.

In pursuance of these provisions and of the contracts of June, 1855, the Florida Railroad Company issued and paid over to the contractors and their successors, from time to time as the work progressed, all its first mortgage bonds, secured by a mortgage on its railroad from Fernandina to Cedar Key, and also a portion of its bonds, secured by a mortgage which was a second lien on the railroad from Fernandina to Cedar Key, but a first lien on certain town sites and other lands belonging to the company.

As heretofore stated, the road from Fernandina to Cedar Key was completed in 1861, and, the company having failed to pay its interest, the trustees of the internal improvement fund took possession of the road, and sold it at auction to the highest and best bidder as provided for in the act of 1855.

The contention now is that such sale was void, because the road between Fernandina and Cedar Key was not the road designated and pointed out, in the various acts of the legislature, as the one on whose completion and after default the trustees were authorized to sell; that the road intended should extend from Fernandina to Tampa Bay.

We think that this contention has not been successfully maintained. No doubt, some of the language used in the act of 1853 and in the amendatory act of December, 1855, might be read as indicating or designating Tampa Bay as the western terminus of the railroad, and Cedar Key as the terminus of a branch or extension. Yet the history of the legislation and of the transactions thereunder satisfactorily shows that such a construction was not put upon the acts of incorporation, either by the company itself, by the contractors who constructed the road, by the trustees of the internal improvement fund, or by the State of Florida.

As we have seen, the company, in accepting the benefits of the act of January 6, 1855, designated the road which they intended to build as extending from Amelia Island in the

direction of Tampa, as far as a point proper for divergence, to Cedar Key, and from said diverging point to Cedar Key. In the same letter of acceptance it was further said that if the amendment to their charter then pending in the legislature (meaning the act of December, 1855) were granted, they would also construct the balance of the road to Tampa.

Before the act of December, 1855, was passed the company contracted for the construction of the road from Fernandina to Cedar Key, and agreed to pay the contractors with first mortgage bonds upon that road, and these bonds and mortgage were issued accordingly. Subsequently the company made separate contracts for the construction of the route from the diverging point to Tampa and put a distinct mortgage upon it.

The railroad company, upon the completion of its road to Cedar Key, and the trustees of the improvement fund, recognized this as a road completed under the provisions of the act of 1855, the one by paying and the other by receiving the interest and the sinking fund charges on the first mortgage bonds from March, 1861, to November 5, 1863, when default was made.

The contractors agreed to build the road as an entirety from Fernandina, or Amelia Island, to Cedar Key, and accepted in payment, and sold to the public, bonds of the company, secured by a first mortage thereon.

The trustees of the improvement fund not only recognized these first mortgage bonds as securities coming within the provisions of the act of 1855 by receiving and applying the interest paid them by the company, but, at last, in 1866, took possession of the road and franchises, as they were empowered to do in the act, and sold them to parties, who organized a new company.

Finally, the State of Florida, by its act of January 18, 1872, recognized the new company as one owning the property formerly belonging to the Florida Railroad Company, and authorized its change of names.

The second ground relied on by the appellants, as invalidating the regularity of the sale, is the allegation that the persons who acted as trustees of the internal improvement

fund, in taking possession of the railroad and selling it, were not legally entitled to act as such; that they were not really officers of the State of Florida.

The second section of the act of January 6, 1855, declares that the governor of the State, the comptroller of public accounts, the state treasurer, the attorney general, and the register of state lands, and their successors in office, shall constitute the trustees to act under the provisions of the act. And we are asked to take notice of the historical facts of the civil war, and that the state government of Florida, in 1866, was declared by the act of March 2, 1867, to be illegal, and that between the outbreak of the rebellion and the adoption by the people of Florida, in May, 1868, of a new constitution, there was an interim or interregnum, during which there were no state officers in Florida qualified and competent to exercise the powers and duties of trustees of the internal improvement fund in accordance with the provisions of the act of 1855.

This contention is disposed of by referring to the well-settled doctrine, affirmed in repeated decisions of this court, that " the acts of the several States, in their individual capacities and of their different departments of government — executive,· judicial, and legislative — during the war, so far as they did not impair, or tend to impair,' the supremacy of the National authority or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds ·of society or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated, precisely as in time of peace. No one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects when they were not hostile in their purpose or mode of enforcement to the authority of the National government, and did not impair the rights of citizens under the Constitution." *Horn* v. *Lockhart*, 17 Wall. 570, 580.

In *Sprott* v. *United States*, 20 Wall. 459, 464, the same views were expressed : The insurgent States "merely transferred the existing state organizations to the support of a new and different national head. The same constitutions, the same laws for the protection of property and personal rights, remained, and were administered by the same officers. These laws, necessary in their recognition and administration to the existence of organized society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or false Federal power. They were the fundamental principles for which civil society is organized into government in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised. It is only when in the use of these powers substantial aid and comfort were given or intended to be given to the rebellion, when the functions necessarily reposed in the State for the maintenance of civil society were perverted to the manifest and intentional aid of treason against the government of the Union, that their acts are void."

Without further citation or consideration, we conclude that the act of the trustees in selling this railroad in November, 1866, cannot be impeached for want of power to act.

It is next claimed on behalf of the appellants that the sale and conveyance of the railroad were voidable by reason of the alleged fraud and collusion of the defendants Yulee, Dickerson, and their associates, conspiring together to procure the default of the Florida Railroad Company in the payment of its interest, and thus to bring about the sale of the road.

We do not feel constrained to enter at length into a discussion of the evidence adduced under this part of the case. We have, however, examined the evidence and considered it in the light of the verbal and printed arguments on behalf of the appellants ; but we are unable to see that the complainants have overcome the direct, positive, and responsive answers of the several defendants. As against those answers the complainants have adduced very little, if any, satisfactory proof. The weight of the evidence, apart from the evidential character of the answers, is clearly to the effect that the railroad, at the

time of the sale, was in a thoroughly dilapidated condition, and that, in view of such condition and of the state of the country, the price realized was not inadequate.

The court below, in dismissing the bills, proceeded chiefly on the ground that the complainants had lost whatever rights they might have had by their gross laches. In this view of the case we fully concur.

Robert H. Johnson did not file his bill till nearly seven years had elapsed from the time of the sale, and he gives no satisfactory explanation of his delay. Within that time, in May, 1869, a mortgage had been issued by the new company to Stewart and Conkling as trustees, and who are parties defendant by intervention. This mortgage was to secure an issue of bonds amounting to $2,300,000, the proceeds of which have gone into the reconstruction and equipment of the railroad. Those trustees and the purchasers and holders of those bonds must be deemed *bona fide* purchasers, without notice of the claim of the complainants. The other complainants, Corcoran and Riggs, did not come into the case till it had been pending for years. Neither do they or Johnson give any explanation of their long delay. They do not aver any concealment of the facts as they existed at the time of the sale of the road in 1866. They do not aver, much less prove, that they were in ignorance of those facts, or that they were in anywise prevented or impeded from ascertaining the facts or from instituting proceedings.

In *Galliher* v. *Cadwell*, 145 U. S. 368, 372, this court said: "In *Harwood* v. *Railroad Co.*, 17 Wall. 78, a delay of five years on the part of stockholders in a railroad company in bringing suit to set aside judicial proceedings, regular on their face, under which the railroad property was sold, was held inexcusable. In *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587, a director of a corporation who had loaned money to it, and subsequently bought its property at a fair public sale by a trustee, was protected in his title as against the corporation, suing four years thereafter to hold him as trustee of the property for its benefit, it appearing that in the meantime the property purchased had increased rapidly in value. In *Brown* v. *County*

*of Buena Vista,* 95 U. S. 157, a county was held barred by its laches from maintaining, at the end of seven years, a suit· to set aside a judgment fraudulently obtained against it; and that, too, though it did not affirmatively appear that the supervisors of the county had knowledge of the existence of the judgment till about twenty months before the commencement of the suit . . . The cases all proceed upon the theory that laches is not, like limitation, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced — an inequity founded upon some change in the condition or relations of the property or the parties." In *Johnston* v. *Standard Mining Co.,* 148 U. S. 360, it was said: " The law is well settled that where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry. This principle was applied . . . in *Foster* v. *Mansfield &c. Railway,* 146 U. S. 88, to a case where a stockholder in a railway company sought to set aside the sale of the road, which had taken place ten years before, when the facts upon which he relied to vacate the sale were of record, and within easy reach. . . . Where property has been developed by the courage and energy, and at the expense of the defendants, courts will .look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require not only clear proof of fraud but prompt assertion of plaintiff's rights."

We are thus brought to the conclusion that the appellants have not sustained their claim that the' action of the trustees in making the sale of the railroad was void either from a mistake in interpreting the meaning of the statutes or from any want of power as official persons ;. that they have likewise failed to show by preponderating evidence any fraud or collusion on the part of Dickerson and his associates in their purchase of the Florida railroad ; and, finally, that they are precluded by the long and unexplained lapse of time between the acts complained of and the institution of legal proceedings from

maintaining such proceedings as against innocent third parties whose interests have become involved.

The decree of the court below dismissing the bills of complaint is

*Affirmed.*