# RANKIN, RECEIVER OF THE BERLIN NATIONAL BANK, v. EMIGH.[1]

## ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

### No. 144. Argued April 15, 18, 1910.—Decided May 31, 1910.

On error to a state court of last resort in a case involving the liability of a national bank under a contract, the findings of fact of the state court are binding on this court, and only the Federal question as to the effect of the facts found can be passed on.

Although restitution of property obtained under a contract which is illegal because *ultra vires*, cannot be adjudged by force of the illegal contract, the courts will compel restitution of property of another obtained without authority of law; and, although the contract under which a national bank obtains money from an innocent third party may be *ultra vires* under Rev. Stat., §§ 5133–5136, the bank may be required to return the money so received to the party entitled thereto. *Citizens' Central National Bank* v. *Appleton, Receiver*, 216 U. S. 196.

In this case, even if the purchase and carrying on of a mercantile company by a national bank was illegal, the persons dealing with the mercantile company were entitled to receive the money paid into the bank for their account.

134 Wisconsin, 565, affirmed.

THE facts, which involve the liability of a national bank under a contract claimed by the receiver to be *ultra vires*, are stated in the opinion.

*Mr. Rufus S. Simmons*, with whom *Mr. Frank J. R. Mitchell* and *Mr. S. C. Irving* were on the brief, for plaintiffs in error.

*Mr. J. C. Thompson*, with whom *Mr. E. F. Kileen* was on the brief, for defendants in error.

---
[1] Original docket title Earling, Receiver, &c. v. Emigh.

Mr. Justice White delivered the opinion of the court.

To reverse a judgment of the Supreme Court of Wisconsin (134 Wisconsin, 565), affirming a judgment of the Circuit Court of Green Lake County, this writ of error is prosecuted.

The Berlin National Bank, doing business in the city of Berlin, Green Lake County, Wisconsin, being insolvent, its doors were closed by the Comptroller of the Currency on November 17, 1904. P. R. Earling was subsequently appointed and qualified as receiver. On November 27, 1906, John Emigh and O. L. Atkins, as assignees of a large number of persons, commenced this action in the state court against the receiver and the bank. It was, in substance, averred that large quantities of milk had been furnished by the assignors of the plaintiffs to a creamery known as the Jenne Creamery Company, under agreements that all the milk supplied should be converted into butter, the butter sold, and the proceeds, less a sum agreed upon as a compensation for the services rendered, should be divided *pro rata* among those furnishing the milk. It was alleged that the creamery, during the period covered by the claim, was, in fact, owned by and had been operated by the bank, and that when the doors of the bank were closed there were outstanding unpaid checks for about $400, for collections made for account of those who had supplied milk between April and September, 1904, and that a large amount had been collected and not paid over for the proceeds of butter made from milk furnished during October and the first half of November, 1904. The prayer was that plaintiffs recover from the receiver such portion of the collections as had come into the hands of the receiver, and as to the proceeds which had been diverted by the bank, that plaintiffs be recognized as general creditors, entitled to participate *pro rata* in the

distribution of the assets of the bank. · The defendants separately answered, and, except as to the allegations regarding the incorporation of the bank, its insolvency and the appointment of a receiver, took issue upon the averments of the complaint.

The cause was tried by the court. The facts, as found, are thus summarized:

For some time prior to October 1, 1902, the Jenne Creamery Company, a Wisconsin corporation, having its principal place of business in the city of Berlin, carried on the business of making butter and other dairy products with milk furnished by patrons in Green Lake and other counties. The corporation for these purposes, besides operating its plant at Berlin, leased various other creamery plants in the vicinity. At one time the business was carried on by a firm known as D. J. Jenne & Company, and after the organization of the Jenne Creamery Company the creamery business was solely carried on by that corporation, the members of the firm of Jenne & Company, however, owning all the stock of the creamery company. The milk which the company separated was furnished by numerous producers under agreements by which, for a stated compensation, the creamery company agreed to make all the milk it received into butter, to sell the same, collect the proceeds, and to divide them *pro rata* among the milk owners less the compensation agreed upon. The business did not prosper. On October 1, 1902, there were outstanding unpaid checks of the company, drawn on the Berlin bank in favor of milk producers, to the extent of about $8,000, there being no funds on hand to the credit of the creamery company in the bank available to pay the checks. On the same date one of the firm of D. J. Jenne & Company owed the bank $2,200, which was unsecured, and besides was indebted to other creditors for at least $2,600. The firm of D. J. Jenne & Company also owed the bank $5,000. Evidently in contemplation

of securing the payment of these various debts and to prevent the loss which would be occasioned by the bankruptcy of the creamery company, and upon the expectation that the situation might be relieved by carrying on the business under a new management, an arrangement was made between the Jennes and the Berlin bank. By this arrangement the entire stock of the creamery was assigned to Brown, the cashier of the bank, and two other officers of the bank, who, while thus becoming in form the owners of the stock, really held it for account of the bank. The property of the partnership of Jenne & Company and the property of the individual members of the firm was transferred to Brown. In order to bring about these transfers the bank agreed to pay the outstanding checks drawn against it by the creamery company in favor of milk producers. Under the arrangement the business continued to be carried on in the name of the Jenne Creamery Company, although from the facts which we have just stated it is apparent, as said by the Supreme Court of Wisconsin, "that the use of Brown's name was only formal, and that the continuance in form of the corporation was only for convenience of bookkeeping and dealing with the patrons." Brown acted as manager of the business apparently for the creamery company, signing and endorsing checks in the name of that corporation as such manager, etc.

The producers of milk were not parties to the transfer made by the Jennes to the bank. No formal notification to them was given of the fact that the bank in effect owned the stock of the corporation and was virtually carrying on the business, no new contracts were made with them in the name of the bank as the owner of the creamery, but, so far as they were concerned, the affairs of the creamery company were, in form, conducted as they had been previously carried on, the producers continuing without interruption to furnish their milk as they

had been in the habit of doing under the agreements previously made.

The operation of the business after the transfer was not profitable. The bank realized a few thousand dollars from the sale of the individual property of Jenne, but when the bank ceased to do business, in November, 1904, the account of the creamery company was apparently exhausted, and the bank had not recouped itself for the payments made of the $8,000 of checks outstanding in October, 1902. Besides, when the bank failed there was outstanding checks for $406.97, issued between April and October, 1904, and no settlement had been made with those who had supplied milk during the month of October and part of November, 1904, prior to the suspension of the bank. Referring to the proceeds of the butter made from the milk delivered by the patrons of the creamery during October and November, 1904, the trial court, as stated by the Supreme Court of Wisconsin, found "that bank drafts had been received into the bank for such butter. Such drafts ran to the Jenne Creamery Company, and were endorsed by Brown, the cashier, and mingled with other moneys of the bank. The total amount was $2,520.46. It was found by the court, upon careful analysis of the accounts, that at all times after the receipt of any of said drafts the bank had on hand an amount of money and cash items exceeding said total, and such an amount was turned over to the receiver upon his taking possession. It also traced a considerable share of said drafts into the hands of the bank's correspondents at other cities, by which they had been collected and credited to the bank, and in each case it was found that there remained a credit account with that correspondent larger than the amount of such drafts sent to and collected by it, which credit balance was turned over to the receiver after his appointment."

Upon the facts by it found the trial court adjudged that

$2,520.46 should be paid to the plaintiffs out of the funds in the hands of the receiver, and that as to the sum of the outstanding checks given for the proceeds of butter sold prior to October, 1904, the plaintiffs were entitled to participate *pro rata* with the other general creditors in the distribution of the assets of the bank. As already stated, the Supreme Court of Wisconsin affirmed the judgment.

The Federal question relied on is in substance that the Berlin bank, as a national bank, had no power to operate a creamery, and could not, therefore, lawfully incur liability on account of such operation, and hence the judgment of the state court is repugnant to the following sections of the Revised Statutes: 5133 and 5136, which prohibit a national banking association from doing other than a banking business; 5134 and 5190, which prohibit such an association from transacting the business of a bank in any other place than where its banking house is located and that specified in its organization certificate; 5145, which requires the affairs of such association to be managed by not less than five directors; and 5236 and 5242, which require ratable dividends and prohibit all transfers with a view to preference. It is true that there are other assignments of alleged error, but we put them at once out of view, as they in substance but assert that the court below erred in affirming the judgment of the trial court because certain of the facts found were not sustained by the evidence, contentions which are not open to our inquiry, as it is elementary that on error to a state court of last resort in a case of this character the findings of fact of the state court are binding on us.

The trial court found, as a fact, that after the transfer of the creamery property in October, 1902, some of the patrons were informed that the officers and directors of the bank were individually interested in the creamery, but that they were acting for the bank was not made

known, and it was also represented to such patrons that the creamery was in better condition than ever before, and such was generally believed by the patrons to be a true statement of the condition of affairs until after the failure of the defendant bank. The Supreme Court, however, evidently, did not consider these circumstances material. It held that whatever the form of the transaction, the Berlin bank acquired the creamery property from the Jenne Creamery Company in October, 1902, that it operated the same thereafter until the bank ceased doing business, that it "took the milk furnished by the patrons, made the same into butter and sold it and collected the proceeds;" and that by virtue of the agreements under which the milk was furnished the proceeds of the sale of butter "belonged to the patrons and was received by the bank for them and under a duty to pay it to them." It also decided that when the bank failed on demand to pay over the collections for the butter sold prior to October, 1904, represented by outstanding checks, an indebtedness to the owners of the money arose. From the facts as found by the trial court the Supreme Court concluded that the receiver had received, in actual money, or in credits with correspondents, the $2,520.46 belonging to the patrons collected for the butter made from the milk supplied in October and November, 1904, and that the receiver did not receive such sum as moneys of the bank upon any trust to distribute to the creditors of the bank, but held it as trustee for the owners. In declining to consider whether, as contended, it was beyond the power of the bank to engage in the creamery business, the court said:

"No authority has been cited, and we think none can be, to deny the power of a banking corporation, or any other corporation, to disgorge property of another which it had got into its possession by any means whatever under a duty to disgorge. It may have had no legal

power to take. the steps by which the money of these plaintiffs' assignors came to its hands; but having taken such steps and obtained their money no such absurdity exists as a legal obstacle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. *Beloit* v. *Heineman,* 128 Wisconsin, 398, 401."

As we are bound by the findings of fact made below, and as the construction which the court gave to the contracts under which the milk was furnished is also binding, since such construction presents no question of a Federal nature, it follows that all the contentions relied upon to procure a reversal of the judgment must rest upon the assumption that, although the milk was received under contracts- of bailment and the proceeds arising were the property of the milk producers, and were held by the bank for them, nevertheless the judgment was wrong, because the bank, under the national banking law, exceeded its powers when it virtually acquired the stock of the creamery and operated the same through its officers. But when the contentions thus come to be considered in their ultimate aspect their unsoundness is demonstrated by the decision rendered at this term in *Citizens' Central National Bank of New York* v. *Appleton, Receiver of the Cooper Exchange Bank,* 216 U. S. 196. We say this, even conceding, for the sake of the argument, the *ultra vires* nature of the transaction as contended for. Although it would suffice to refer to that case as decisive here, in view of the importance of the subject we briefly advert to the facts of the case to make apparent how absolutely conclusive the ruling there made is upon the contention here presented. One Samuel owed to the Central National Bank $10,000. Evidently the bank was not only unwilling to lend Samuel more money, but called upon him to pay off his existing indebtedness. Under these circumstances it was arranged that if Samuel could borrow $12,000 from the Cooper

Exchange Bank and would use $10,000 of the amount to pay his debt to the Central National Bank, that bank would guarantee the repayment of the loan if made by the Cooper Exchange Bank, thus giving Samuel some further accommodation, and at the same time placing the Central National Bank in funds to the extent of its outstanding loan to Samuel. The loan upon the guarantee was made. Upon the bankruptcy of Samuel and the failure to pay the loan made by the Cooper Exchange Bank, the latter bank sued the Central National Bank to recover under the guarantee. In the state courts, while ultimately the *ultra vires* nature of the guarantee was not denied, recovery was allowed to the extent of the $10,000, the amount actually received by the Central National Bank of the moneys of the Cooper Exchange Bank. This court, without in any respect questioning that the state court was correct in holding that the contract of guarantee was *ultra vires* of the National Bank Act, nevertheless affirmed the judgment below. Reviewing and commenting upon the rulings in *Logan County National Bank* v. *Townsend,* 139 U. S. 67; *Aldrich* v. *Chemical National Bank,* 176 U. S. 618; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24; and *Pullman's Palace Car Co.* v. *Central Transportation Co.,* 171 U. S. 138, it was held although restitution of property obtained under a contract which was illegal, because *ultra vires,* cannot be adjudged by force of the illegal contract, yet, as the obligation to do justice rests upon all persons, natural and artificial, if one obtains the money or property of others without authority, the law, independently of express contract, will compel restitution or compensation. That this ruling is here applicable is plainly manifested by the fact which we have previously pointed out that the relief afforded by the court below simply gave to the producers so much of their property as was actually in the hands of the receiver, and awarded them a right to recover as

general creditors of the bank to the extent only that their property had been received and appropriated by the bank.

*Affirmed.*