CHARLES E. HELLIER *vs.* EDGAR O. ACHORN & others, executors.

SAME *vs.* SAME.

Suffolk.   December 10, 1925. — March 29, 1926.

Present: BRALEY, PIERCE, WAIT, & SANDERSON, JJ.

*Practice, Civil,* Conduct of trial, Auditor's report. *Evidence,* Presumptions and burden of proof. *Contract,* Validity. *Corporation,* Officers and agents. *Conversion.* *Executor and Administrator.*

No exception will be sustained to action by a judge recalling an action from the jury after he had submitted special questions to them and ordering the return of a verdict for the defendant, if the ruling ordering the verdict was warranted.

An auditor, to whom was referred an action in which an issue was, whether the plaintiff had given to the defendant's testator a proxy to vote certain corporation stock, found that such proxy was given. At the trial of the action before a jury, the auditor's report was in evidence and the plaintiff testified that he gave such a proxy, and in another part of his testimony that he did not remember whether he gave the proxy.

*Held*, that the equivocal testimony by the plaintiff was not enough to control or to affect the value as evidence of the definite finding by the auditor.

An agreement binding a stockholder in a corporation to a vote which may be inconsistent with the performance of his duty as a stockholder is void.

An agreement by one, to whom the holder of the voting control of the corporate stock of a corporation transferred enough of his stock so that the control passed, that he always would protect the transferor's control so that the transferor could work out the corporation's problems for the interest of bondholders and the corporation, or that he would protect the transferor so long as he did his best for the corporation, is void, since it might not be for the best interests of the corporation that the transferor be in control of, or in the employment of, the corporation.

At the trial of an action by the transferor for alleged breach of the contract above described, the plaintiff contended that the agreement might be found to be valid because there was evidence that all the stockholders knew of it and assented to it. There was no evidence that the transferor, in a conference with a representative of the only other stockholder when the alleged assent was given, stated to him the terms of the agreement or that the representative of the remaining stock or his principal agreed to those terms. *Held*, that the contention was without merit.

Where the owner of shares of stock of a corporation delivers them to another, with an oral agreement relating to the manner in which they shall be voted which the transferee fails to perform, the shares do not *ipso facto* revert to the transferor upon such failure by the transferee to perform and he is not entitled to maintain an action of tort for the conversion of the shares until he has made a demand for them and the transferee has refused to comply with the demand.

Where, in the declaration in an action of tort against the executor of a will for the conversion of shares of stock, the plaintiff relied upon an alleged conversion by the executor of the stock which the plaintiff had transferred to the testator, and at the trial it appeared that a demand for the return of the stock was a prerequisite to the maintenance of the action and that no such demand had been made upon the executor before the bringing of the action, it was proper to order a verdict for the defendant.

Stock transferred under the terms of an illegal agreement cannot be recovered by the transferor after there has been partial performance of the agreement on the part of the transferee.

CONTRACT, with a declaration in eight counts, for damages alleged to have resulted from breaches by the defendant's testator of a contract, described in the opinion, relating to corporate stock of certain corporations and their management and control. Writ dated June 16, 1921. Also, an action of

TORT for conversion of certain corporate stock. Writ dated June 16, 1921.

In the Superior Court, the actions were referred to an auditor by whom they were heard together, and afterwards were tried together before *Flynn,* J. Material evidence and proceedings at the trial are described in the opinion. By order of the judge, verdicts were entered for the defendants. The plaintiff alleged exceptions.

*A. Berenson,* (*T. W. Morris* with him,) for the plaintiff.

*E. F. McClennen,* for the defendants.

SANDERSON, J. The first of these actions, with a declaration in eight counts, is brought against the executors of the will of Robert M. Morse for breach of contract; the second is in tort for conversion of a certificate or certificates for twenty-nine hundred shares of stock of the Elkhorn Coal and Coke Corporation, a Maine corporation, and a certificate or certificates for eleven hundred and twenty-five shares of common stock of the Big Sandy Company, a Maine corporation. The answer to the first action, after making a general denial, alleges, among other things, that the contract is against public policy and void, that the agreement was within the statute of frauds and is not in writing, that if any contract was made it has been performed, and that the plaintiff expressly or by conduct has excused further performance.

The plaintiff, as a law student, entered Mr. Morse's office in 1888, and for many years continued to be associated with him under an arrangement by which Mr. Morse was to pay him a fixed sum annually for general assistance rendered in legal matters, and additional compensation for special work. The plaintiff also had the right to practise law on his own account.

In 1894, a certificate for fifteen thousand shares of stock in the Elkhorn Coal and Coke Company, a corporation organized under the laws of Virginia, was issued to Mr. Morse. Five hundred of these shares were disposed of, and at a later time upon a reduction in the capital stock of the corporation, Mr. Morse's holding was represented by a certificate for twenty-nine hundred shares. A Maine corporation called the Elkhorn Coal and Coke Corporation was organized to take over the assets of the Virginia company, and a certificate for twenty-nine hundred shares in the new

corporation was issued to Mr. Morse as the equivalent for his stock in the Virginia company.

In 1904, a certificate for eleven hundred and twenty-five shares of the capital stock of the Big Sandy Company, a corporation organized under the laws of Virginia, was issued to Mr. Morse. A Maine corporation (the Big Sandy Corporation) was organized to take over the assets of this Virginia company; and Mr. Morse, at the time of his death, either had a certificate for the shares in the Virginia corporation or had exchanged it for the same number of shares in the Big Sandy Corporation. The Elkhorn Company of Virginia sold its landed property to the Big Sandy Company of Virginia and took in payment stock of the latter company, and this stock became its only asset. In 1905 after stock of the Big Sandy Company was exchanged, share for share, for stock in the Big Sandy Corporation of Maine, the Elkhorn corporation of Maine held fourteen thousand two hundred and fifty-seven shares of stock in the Big Sandy Corporation of . Maine. This latter corporation had a capital of $5,000,000 but the ten thousand first preferred shares were without voting rights. The ten thousand second preferred shares and the outstanding common shares were entitled to vote. The right to vote the Big Sandy Company stock held by the Elkhorn Coal and Coke Corporation was given to the attorney for two brothers named Weld and the plaintiff, jointly, in 1909. The auditor found that although there were forty thousand shares of second preferred and common stock of the company at this time, many of these shares were in the treasury, and that the shares owned by the Elkhorn Coal and Coke Corporation controlled the Big Sandy Corporation.

The case was tried to a jury upon the auditor's report and other evidence. At the close of the evidence, the defendants filed a motion for directed verdicts, which was at first denied, and certain questions were submitted to be answered. Before the jury had reported answers to the questions, they were recalled and by direction of the trial judge returned a verdict for the defendant in each case. The plaintiff's exception to the right of the judge to order a verdict

after questions had been submitted to the jury is without merit.

Upon the findings of the auditor, the contract alleged by the plaintiff was not made and there was no breach of contract; the stock alleged to have been converted was not owned by the plaintiff and there was no conversion. But, in deciding whether the orders directing verdicts for the defendants were right, it must be assumed that the jury would take the view of the evidence most favorable to the plaintiff and follow the auditor's report only in so far as there was no evidence tending to contradict or modify it. Upon the plaintiff's testimony, the jury could have found that in 1894 he owned certain shares in the Elkhorn Coal and Coke Company of Virginia, and at the request of Mr. Morse, to recoup him for his losses, gave him the fourteen thousand five hundred shares of this stock above referred to; that the plaintiff said to Mr. Morse when the request for stock was made, "Well, Mr. Morse, I must protect my control of this situation," and that he had said to bondholders that they would get their money back and that they were looking to him to do it and he must be protected in doing it. Mr. Morse said, "Of course, Hellier, I will always protect your control so that you can work out this for the interest of the bondholders and for the corporation . . . . As long as you hold your stock, I will hold mine. You shall have my proxy, and I will protect you and do everything I can to aid you in working out this matter and protect you while you are doing it"; and the plaintiff told Mr. Morse it might take years to do it; and Mr. Morse said he would hold his stock and the plaintiff would hold his until the property was sold; that they would not sell their stock but sell the property; that the plaintiff told Mr. Morse he would do his best for the corporation, and Mr. Morse said he would protect the plaintiff in doing that as long as he did his best for the corporation, and the plaintiff said to Mr. Morse that he would give him the stock on those conditions.

The jury could further have found that in 1904 the plaintiff owned certain shares of the common stock of the Big Sandy Company of Virginia, and at Mr. Morse's request gave

him without consideration the shares of stock in that company above referred to. Upon the plaintiff's testimony he told Mr. Morse that the Elkhorn company had control of the Big Sandy and the plaintiff's control of Elkhorn stock through Mr. Morse's proxy carried with it control of Big Sandy; that Mr. Morse said he reiterated and affirmed the conditions and would abide by them; that there was no change in the arrangement or agreement with Mr. Morse with respect to control of the company, or about his holding stock until the plaintiff had opportunity to work the proposition out, at the time when the stock was reduced; that Mr. Morse agreed to hold this stock just the same as the other. Mr. Morse said it was his duty to see that the corporation protected the plaintiff's work for the protection of the corporation, the bondholders, creditors and stockholders; that he would see that the plaintiff had a square deal and do everything he could to see that the plaintiff was properly compensated for his work; that he agreed to give the plaintiff protection in his control and that giving the right to vote the Elkhorn stock to the attorney for the Welds and the plaintiff jointly would not destroy that control. The plaintiff also testified in substance that the stock in the Maine corporations was held exactly like the stock in the Virginia corporations.

In May, 1919, Mr. Morse wrote the plaintiff that he thought a receiver should be appointed for Big Sandy. In reply the plaintiff wrote that Big Sandy had no debts nor guaranties and was not likely to be embarrassed, and that if he could not get the results he would be glad to stand aside and let some one else try. The plaintiff resigned as president about the end of June, 1919. His testimony as to the facts leading up to this resignation is in substance that on June 19, 1919, he received a telegram from Mr. Morse and substantially all the Boston stockholders containing the following statement: "We have agreed upon reorganization of Elkhorn and Big Sandy Companies and request you to return here at once." At this time both Mr. Morse and the Weld interests wanted the property sold. The plaintiff next saw Mr. Morse on June 21 at Falmouth and Mr. Morse informed him

that one French had procured a customer to purchase the property for $2,000,000, from parties who were unwilling to deal with the plaintiff, and that in order to put the sale through it would be necessary for Mr. Morse to take charge of the property. The plaintiff stated that he was willing to have these other men employed if the directors were willing to have them make the effort to bring about the sale. He was willing that $2,000,000 should be received from the property and if he was a stumbling-block in negotiations he would be willing to have it go through with somebody else conducting it. He testified that he did not intend to agree to include stock of the Kentland Coal and Coke Company owned by the Big Sandy Company in the sale for that price. The plaintiff said he did not believe French had an offer, and Mr. Morse said he was sure he had; and the plaintiff thought Mr. Morse believed French had the offer. Mr. Morse told the plaintiff that nothing would be done that did not have the plaintiff's approval. The plaintiff testified that he did not intend to give up his contract for control and there was no acceptance of his offer to give it up, if he made such an offer. The plaintiff gave Mr. Morse his proxy. He testified that he gave it for the purpose of putting through the sale and in doing this he believed and relied on Mr. Morse's statement that the sale was going to be carried through. He knew that at a meeting to be held June 30, 1919, the stockholders intended to authorize the sale to French's customer and to elect a new board of directors and that he (Mr. Hellier) was not to be elected. He had given his proxy to Mr. Morse to be used in any way he saw fit, and with the purpose of having the meeting unanimous. Mr. Lazenby, then the plaintiff's partner, was elected director in his place. The plan was to have another president to put through the sale. He hoped they would not put him out but he gave the proxy for the purpose of electing another board of directors. On July 6, 1919, he urged Mr. Morse not to sell the Kentland Company stock and protested against making Big Sandy an operating company. The property of Big Sandy was not sold. The testimony of the plaintiff, that he did not remember whether he gave a proxy to Mr. Morse, might have

weight with the jury in deciding whether it modified his other statement that he had given such proxy, but it is not enough to control the definite finding of the auditor that he gave the proxy. *Anderson* v. *Metropolitan Stock Exchange*, 191 Mass. 117, 119.

An agreement binding a stockholder to a vote which may be inconsistent with the performance of his duty as a stockholder is void. *Guernsey* v. *Cook*, 120 Mass. 501. *Noyes* v. *Marsh*, 123 Mass. 286. *Woodruff* v. *Wentworth*, 133 Mass. 309. *Palmbaum* v. *Magulsky*, 217 Mass. 306.

It was held in *Guernsey* v. *Cook, supra,* page 502, that an agreement to secure to a stockholder an office in a corporation with a fixed salary is void as against public policy and as a fraud on the other members of the corporation. "It was the purpose and effect of the contract to influence the defendant, in the decision of a question affecting the private rights of others, by considerations foreign to those rights. The promisee was placed under direct inducement to disregard his duties to other members of the corporation, who had a right to demand his disinterested action in the selection of suitable officers. He was in a relation of trust and confidence, which required him to look only to the best interest of the whole, uninfluenced by private gain. The contract operated as a fraud upon his associates." An action in affirmance of such a contract cannot be maintained.

It was said in *Noyes* v. *Marsh, supra,* that an agreement with a person, that, if he would buy certain shares of stock in a corporation, the corporation would employ him at a certain yearly salary, should be held to be void as against public policy.

In *Woodruff* v. *Wentworth, supra,* the court held that if one stockholder in consideration of a sum of money paid by the other agreed to vote for a certain person as manager of the corporation and to vote to increase salaries of the officers of the corporation, including that of manager, the agreement is void as against public policy unless assented to by all the stockholders; and it was said to be a question whether the contract would be valid even if such assent had been obtained. If a part of the consideration for a contract is void,

it taints the whole when the promise is single. A stockholder when voting at a meeting owes his fellow stockholders the duty of acting fairly and in good faith.

In *West* v. *Camden*, 135 U. S. 507, 520, 521, an agreement by a director to keep another person permanently in place as an officer of the company was held to be void as against public policy even though there was not to be any direct private gain to the promisor. The court said: "The agreement . . . was one . . . whereby . . . [the defendant] might be required to act contrary to the duty which, as an officer . . . he owed to that company and to the stockholders other than the plaintiff. . . . It does not appear that the defendant was to receive direct personal pecuniary compensation or gain for what he was to do. The plaintiff, on his own showing, dealt with the defendant in reference to the fiduciary relation which the latter bore to the stockholders . . . bound the defendant as to his future action as a director . . . and an agreement to keep the plaintiff permanently in the position of vice-president of that company, irrespective of its interests. It amounted to a stipulation on the part of the defendant that no contingency should happen which should require a change of management and a reduction of expenses. . . . it was the right of the other stockholders . . . 'to have the defendant's judgment, as an officer . . . exercised with a sole regard to the interests of the company.'" "Where an agreement is made which is either contrary to public policy or fraudulent as to third parties, it will not be enforced, although in the particular instance no injury may have resulted." *Palmbaum* v. *Magulsky*, 217 Mass. 306, 308. *Gibbs* v. *Smith*, 115 Mass. 592.

The contract in the case to be decided does not come within the principle of the voting trust agreements which have been held to be valid. *Brightman* v. *Bates*, 175 Mass. 105. *Bullivant* v. *First National Bank of Boston*, 246 Mass. 324.

The plaintiff contends that the case at bar is to be distinguished from *Guernsey* v. *Cook, supra*, on two grounds, (1) because the agreement was to keep the plaintiff in control so long as he worked for the best interests of the corporation; and (2) because there was evidence that all the stock-

holders knew of the agreement between the plaintiff and Mr. Morse, and assented to it. The plaintiff did not testify that the agreement was to protect him in his control so long as he worked for the best interests of the corporation, and the question as to the validity of such an agreement is not presented. He testified that Mr. Morse said he would always protect the plaintiff's control so that he could work it out for the interest of the bondholders and the corporation; and in another part of his testimony he quoted Mr. Morse as saying that he would protect the plaintiff as long as he did his best for the corporation. If it be assumed that the agreement was to keep the plaintiff in control as long as he did his best for the corporation, it would still be illegal for the reasons stated in the cases hereinbefore cited. A man might do his best for a corporation and still not be the best man to be employed or kept in control of a corporation.

The second ground urged for distinguishing the case from *Guernsey* v. *Cook, supra,* is also untenable. The date of the alleged contract with Mr. Morse is not definitely stated, except that it was about September 1, 1894. The Elkhorn Coal and Coke Company had its inception in connection with the foreclosure of a mortgage on the property of the Virginia Mining and Improvement Company. It appears that when this mortgage to secure the payment of three hundred bonds of the Virginia Mining and Improvement Company was foreclosed, the plaintiff arranged with the bondholders that, if he bought the property, it would be turned over to a new company which would issue its bonds for the bonds in the mining company; that the Welds held a substantial number of the bonds in the mining company, and the plaintiff agreed with them that, in addition to bonds in the company to be organized, they were to have forty-two per cent of the stock of the new company. This agreement bound him to deliver to the Welds that portion of the stock. In pursuance of this arrangement the Elkhorn Coal and Coke Company of Virginia was formed and on August 1, 1894, a certificate for the whole capital stock of that company was issued to the plaintiff. Mr. Morse held twenty-four bonds in the mining company, but the plaintiff testified that there was no agree-

ment with him in regard to stock in the new company until it was delivered, although Mr. Morse might have understood that he was to have some of this stock. He also testified that it was a part of his plan to issue stock to certain other people, to whom it was issued but who did not accept it.

The plaintiff's contention that all of the stockholders knew of and assented to his agreement is based upon a conversation which he said he had with one Freeman, in which the plaintiff stated that he would not undertake the task unless he could be protected in his control so that, if he started on it at a good deal of sacrifice to his law business, he would be protected in the result of his work. He outlined to Freeman his plans for the development of the property which were entirely satisfactory to Freeman. It does not appear when this conversation with Freeman took place or what Freeman's authority was to speak for the Welds except that he was said to be their financial agent. But, if Freeman had authority to speak for the Welds, and if no one else except the plaintiff had rights as a stockholder, it does not appear that the plaintiff stated to him the terms of the agreement with Mr. Morse, upon which he relies, or that either Freeman or the Welds agreed to those terms.

It follows from a consideration of the whole case that, assuming that the terms of the contract upon which the plaintiff relies are sufficiently definite, that the contract related to control of the Maine corporations, that the plaintiff by receiving proxies on Mr. Morse's stock could keep control of the corporations, and that there was evidence of a breach and of no waiver by the plaintiff of his rights, still the contract was unenforceable as against public policy and the exception to the order directing the jury to return a verdict for the defendants in the action of contract must be overruled.

In the action of tort, the defendants (executors of the will of Robert M. Morse) are alleged to have converted to their own use a certificate or certificates for the twenty-nine hundred shares of Elkhorn stock and for eleven hundred and twenty-five shares of Big Sandy stock referred to in the first case. Mr. Morse died February 21, 1920. His executors

were appointed in May of that year. About June 1, 1920, the defendants, as executors, surrendered to the Elkhorn Corporation the certificate for twenty-nine hundred shares and received from the corporation a new certificate in the name of the executors. About April 11, 1921, the executors surrendered their certificate and caused new certificates to be issued to the parties entitled to Mr. Morse's estate as beneficiaries under his will. If the contract had been valid and the plaintiff could prove that he was entitled to have the stock in the Maine corporations delivered to him, it would not revert *ipso facto* upon the failure of Mr. Morse to keep his agreement. Up to the time of the distribution of the stock and for some time thereafter the executors were not aware that the plaintiff intended to assert title to this stock. While there is a statement in a letter, offered but not admitted in evidence, from the plaintiff to the defendant Loring, dated January 4, 1921, to the effect that a part of the stocks held by the Morse estate should be returned to him to recoup his losses and there was evidence that one of the executors had been notified of the plaintiff's intention to sue the Morse estate for breach by Mr. Morse of his agreement with the plaintiff, there is no evidence to control the auditor's finding that the first demand for a return of the stock was made two days after the date of the writ. The stock had then been transferred by the defendants to the beneficiaries under Mr. Morse's will. See *DeYoung* v. *Frank A. Andrews Co.* 214 Mass. 47. The auditor found that the plaintiff relied on a conversion of the stock by Mr. Morse about June, 1919, and the plaintiff so states in his brief. Mr. Morse came rightfully into possession of the stock. He never disposed of it and never, so far as appears, was asked to deliver it to the plaintiff. He could not be held to have converted the stock until a demand was made for its return, even if the plaintiff was entitled to have it returned upon demand. The declaration, however, does not allege a conversion by Mr. Morse, but by the defendants who are executors of his will, and there could be no liability in tort on their part for the acts done by them as executors in any event, unless a demand was made for the return of the stock while they held it and unless

they wrongfully refused to give it up. *Baker* v. *Lothrop,* 155 Mass. 376. *DeYoung* v. *Frank A. Andrews Co., supra.* The directed verdict in the action of tort would also be justified on the ground that the consideration for an illegal agreement cannot be recovered after there has been performance or partial performance. *Duane* v. *Merchants Legal Stamp Co.* 227 Mass. 466, 469. *Duane* v. *Merchants Legal Stamp Co.* 231 Mass. 113.

In deciding these cases, the evidence offered and excluded has been considered and there is nothing in the excluded evidence which, if it had been admitted, would change the conclusion here reached. All exceptions argued have been considered and no reversible error appears.

*Exceptions overruled.*