## CLARK v. BOSTON–CONTINENTAL NAT. BANK et al.
### No. 3713.

District Court, D. Massachusetts.
Dec. 7, 1934.

Tyler, Eames, Wright & Hooper, John P. Wright, Burton E. Eames, Franklin King, Roger F. Hooper, Jesse Morton, David A. Stoneman, and Geo. B. Rowlings, all of Boston, Mass., for plaintiff.

Samuel Hoar, Goodwin, Procter & Hoar, and Murray F. Hall, all of Boston, Mass., for defendant.

BREWSTER, District Judge.

This bill of complaint is brought to establish a claim upon the assets in the hands of the receiver of the Boston-Continental National Bank, first as a preferred creditor and, if not as a preferred creditor, then as a general creditor, in the sum of $300,000.

The cause was referred to a master who has filed in court his report. Both plaintiff and defendant have filed objections to the master's report. The cause comes before the court, therefore, upon the merits and upon the exceptions to the master's report.

### Statement of Facts.

The master in his report has fully covered all phases of the controversy between the parties. The objections to the report are all overruled. I incorporate by reference in this statement of facts the master's findings of fact, as they appear in his report. In order to understand the conclusions of law, it will be necessary to summarize these findings.

(1) The Boston-Continental National Bank (hereinafter referred to as the Bank) arose from the consolidation of the Boston National Bank and the Continental National Bank. It was organized December 27, 1930. The Bank was dominated by its president, one Ragan, who proved to be unfaithful and dishonest. He had permitted and had participated in, directly or indirectly, loans to entirely irresponsible borrowers upon inadequate security. In some instances, the borrowers were merely used as dummies; the proceeds of the loans being used by Ragan for speculation in the stock market. He had deceived his board of directors and the bank examiners by means of surety bonds securing the payment of the obligation, when by secret agreement he had released the surety company from all obligations on the bond. He had committed other acts, both fraudulent and improvident, from which he had derived personal profit. These fraudulent and dishonest transactions, together with the effect of the widespread depression which had depreciated the value of bonds held by the Bank to the extent of nearly $200,000, had seriously impaired the capital of the Bank. Ragan had successfully concealed from the national bank examiners the true condition although, as early as March, 1931, a deputy examiner had seen fit to criticize some of the loans and overdrafts as being too large. The examiner and Comptroller of Currency, however, had taken notice of the depreciated value of the bonds, and the Bank had been ordered to make good this impairment. Following this peremptory demand of the comptroller, efforts were made to interest parties who might be induced to make a capital contribution for the Bank. These efforts, however, were not successful. The time within which the impairment was to be made good was, from time to time, extended by the comptroller to July 1, 1930.

(2) The plaintiff was senior member of the brokerage firm of H. C. Wainwright & Co. Associated with him in the same business was his son, Forrester A. Clark. Early in 1931, Ragan was instrumental in causing the plaintiff to be solicited for assistance. The proposition aroused no interest in the plaintiff, but his son Forrester thought it might be something worth looking into, and he conferred with Ragan about the condition of the Bank. Forrester was in almost daily conference with Ragan, reporting some of these interviews to the plaintiff, until about the 15th of June, when he succeeded in persuading the plaintiff that he might well look into the matter. The plaintiff commissioned his son to undertake the investigation at once. The investigation consisted of an examination by Forrester of the unsecured loans, the secured loans, and the mortgages, getting his information regarding these assets wholly from Ragan himself.

The plaintiff also conferred with the attorney for the Bank and with one of the directors respecting the general condition of the Bank, and from these sources learned that the Bank was in good condition except that the shrinkage in the value of the bonds had impaired the capital of the Bank. The attorney for the Bank acted in good faith, and his representations were based upon information received from the bank examiner and from Ragan and was honestly believed to be true. Ragan also submitted to the plaintiff a list of the important loans with comments as to each. They were represented to be 100 per cent. good. The time fixed for auditing the assets was too short for an independent audit. Either the plaintiff or his son had asked to see reports of the bank examiner, but this privilege had been denied them upon some excuse which, to the plaintiff, appeared to be plausible.

(3) As to many of the outstanding loans, both secured and unsecured, representations were made by Ragan to both Forrester and to the plaintiff which were false and were known by Ragan to be false. In some instances Ragan's statements may have been an expression of opinion, but they were statements of opinion which he did not hold, and could not have held at the time. In that respect they were false representations. Up to the time that the plaintiff entered into the contract hereinafter referred to, pursuant to which he paid over to the Bank $300,000, neither the plaintiff nor Forrester had any reason to suspect that Ragan was dishonest or untrustworthy. There had been suggestions that he was not big enough for the position of bank president, but no suggestion had been made by anybody with whom the plaintiff had conferred that his integrity or truthfulness was questionable.

(4) Relying upon the representations of Ragan, with no reason to believe that he was not telling the truth and without knowledge as to the true condition of the Bank, the plaintiff, on the 29th day of June, 1931, was induced to enter into a contract with the Bank, by the terms of which he agreed to "deposit" with the Bank $300,000, "the same to be held, used and applied by the party of the second part as a guaranty fund to absorb the depreciation in the value of the bonds

held and owned" by the Bank, i. e., "to make good to the extent of Three Hundred Thousand Dollars ($300,000) the difference between the cost of said bonds and their present market value" as appeared on the books of the Bank. The plaintiff was to receive interest on the deposit at the rate of 4 per cent. per annum, if made in cash. The guaranty fund was to be held by the Bank "until such time as the said depreciation in the value of said bonds is eliminated." As the market value of said bonds rose, the guaranty fund was to be diminished and portions of it returned to the plaintiff. After the value of the bonds reached the book value, any profit derived from the sale was to be divided between the plaintiff and the Bank. The Bank further agreed in the contract that it would deposit with the plaintiff resignations of executive officers and directors with a definite understanding and agreement that the plaintiff could use any or all of the resignations at any time, or in any manner, that he might see fit, and that he could nominate and appoint such officers and directors as, in his judgment, he might desire to aid. The Bank also agreed within thirty days after the execution of the agreement to procure options running to the plaintiff, entitling him to purchase within four years 5,000 shares of the stock of the Bank at $20 per share, and within 60 days to procure option for an additional 5,000 shares at the same price. The plaintiff was given the right to sell, dispose of, or trade in any of the bonds of the Bank as he might deem advisable. The Bank further agreed to cause at least 40 per cent. of its outstanding stock to be placed in a voting trust within forty-five days from the execution of the agreement. The agreement further provided that "in the event of liquidation of the party of the second part during the pendency of this agreement and during the life of said guaranty fund, then and in such event the said guaranty fund shall be entitled to priority over the stockholders" of the Bank. In the event that the terms and conditions of the agreement were not complied with, the $300,000 deposited was to be returned forthwith to the party of the first part. The contract was drawn by Ragan and was authorized by the board of directors. The plaintiff refused to enter into the contract unless it had the approval of the Comptroller of Currency. The contract was submitted to the comptroller who indicated that he had no objections to it.

(5) The Bank carried out its part of the agreement, except that it failed to secure the deposit in the voting trust of 40 per cent. of the outstanding stock of the Bank. Resignations of officers and directors were procured but not deposited with the plaintiff. The plaintiff, however, exercised the privilege of naming certain directors in place of those whose resignations had been accepted.

(6) The terms of the agreement were complied with on the part of the plaintiff. On June 29, 1931, he paid into the Bank $300,000 in cash. When the plaintiff paid over the $300,000, Ragan caused a certificate of deposit for $300,000 to be issued by the Bank, payable to the Bank itself or to plaintiff, with interest at the rate of 4 per cent., payable on 30 days' notice. The certificate of deposit was at all times kept in the possession of the Bank and never delivered to the plaintiff. It was carried on the books as a liability under the heading "Time Certificate of Deposit."

(7) The $300,000 was never set apart as a guaranty fund, but was forthwith deposited in the Federal Reserve Bank and by the Federal Reserve Bank credited to the Bank in an account known as the "Reserve Account." The Bank cleared daily through the Federal Reserve Bank checks and other items, and when the checks were not collected on the day they were received from the Bank the items were carried by the Federal Reserve Bank in "an uncollected account" and later transferred to the "Reserve Account" when collected. In other words, no effective credit to the Bank was given for any item until it had been entered in the Reserve Account. The Reserve Account was, therefore, subject to continual change, depending upon the daily deposits and withdrawals. The balance to the credit of the Bank in the Reserve Account, between June 29 and December 15, was never below $259,185.13, which was the balance on December 15. On December 16 the balance had been entirely wiped out, and there was an overdraft of over $22,000. On December 16, the Bank held uncollected items amounting to $177,175. From December 16, 1931, to April 21, 1932, the balance in that account was increased steadily due to the credit of items collected after December 16, but was never higher than $178,670; and on April 21, 1932, the balance stood at $161,501.81. On April 22 this balance was applied by the Federal Reserve Bank against the indebtedness of the Bank on the overdue promissory notes which, by their terms, gave to the Federal Reserve Bank the right to make such application.

(8) In addition to the auditor's report, there is a stipulation respecting certain additional facts which I incorporate by reference in this statement of facts. I find the facts to be as stipulated. Briefly, these facts are that, from the time that the plaintiff deposited his $300,000 up to and including December 16, 1931, deposits were received by the Boston-Continental National Bank of over $39,000,000, and the deposits of new depositors during that period amounted to over $582,000. On December 17, 1931, cash on hand in the Bank amounted to $139,-163.77, which the receiver took over, and between June 29 and December 17, 1931, cash on hand never fell below that sum.

Respecting the method of handling transactions between the Bank and the Federal Reserve Bank, it was stipulated that checks on Boston banks deposited with the Federal Reserve Bank before 10 o'clock a. m. were immediately credited to the Reserve Account. Checks on out of town banks and checks on Boston banks deposited after 10 o'clock a. m. were first credited to the uncollected account and thereafter credited to the Reserve Account, the time of the credit depending upon the distance from Boston of the drawee bank. All checks deposited by the Bank with the Federal Reserve Bank were indorsed as follows: "Payable to the order of the Federal Reserve Bank of Boston. Prior endorsements guaranteed. Boston-Continental National Bank, Boston, Mass."

(9) On December 17, 1931, the Bank was indebted to the Federal Reserve Bank in the sum of over $1,095,000, for which the Federal Reserve Bank held collateral of the face value of $1,130,060. After applying the balance in the Reserve Account, above referred to, it continued to liquidate the indebtedness of the Bank by collecting notes receivable and by the sale of bonds and the application of other credits. On November 3, 1932, it received a 20 per cent. dividend on its proof of claim amounting to $219,012.04. On August 8, 1933, the Federal Reserve Bank, having received the full amount of its indebtedness, turned over to the receiver notes receivable of the face value of $423,572 upon which the receiver has to date collected over $27,385 in cash. The uncollected notes still in the hands of the receiver had a face value on March 31, 1934, of $237,342.

(10) On September 15, 1931, the Bank bought through the Federal Reserve Bank $295,000 face value of the United States 3 per cent. Treasury Bonds, dated September 15, 1931. The Federal Reserve Bank advanced the $295,000 on the credit of the Bank and opened a "War Loan Deposit Account" showing the indebtedness of the Bank to that amount, against which the purchased bonds were deposited as collateral security. From time to time thereafter the Bank, with money withdrawn from its Reserve Account, repaid to the Federal Reserve Bank the entire $295,000; the last payment being made December 15, 1931. From time to time, as it reduced this indebtedness, the Bank withdrew bonds from the War Loan Deposit Account until, on December 11, 1931, there was left in that account only $5,000 worth of such bonds. This $5,000 worth of bonds was never withdrawn by the Bank or its receiver. The $290,000 bonds which the Bank had withdrawn were repledged in December, 1931, with the Federal Reserve Bank as collateral security for loans amounting to $255,000, made by the Federal Reserve Bank during that month. These bonds were thereafter liquidated and the proceeds credited upon the indebtedness of the Bank to the Federal Reserve Bank, the aggregate of which exceeded the amount received from the sale.

(11) On December 14, 1931, a run started on the Federal National Bank which caused a run on the Boston-Continental National Bank on December 15. The Bank met all demands made upon it during that and the following day. The run, however, continued, and on December 16 had assumed such proportions that the directors, early in the morning of December 17, decided that the condition of the Bank was such that it must be closed, and they accordingly, with the plaintiff's knowledge and consent, voted to ask the Comptroller of Currency to take possession of the institution. This was done on that same morning, and thereafter the Bank did not open. A receiver was then appointed who took possession December 26.

(12) The defendant questions the plaintiff's right to rescind the contract of June 29 on the grounds (1) that he did not exercise due diligence and (2) that he ratified the contract after knowledge of the fraud. On this aspect of the case the master finds that, shortly after the plaintiff had deposited his $300,000, the bank examiner had criticized the management of the Bank and some of the loans, and had earnestly recommended that the indebtedness to the Federal Reserve Bank be reduced, but it was not until November that Forrester received any intimation that the venture was a doubtful one; and it was not until December 5 that the plaintiff had the first intimation of Ragan's

dishonest conduct. While, between that date and the final closing of the Bank, there appear to have been strenuous efforts on the part of Forrester and those whom the plaintiff had been instrumental in getting on the board of directors to save the situation, the master reached the conclusion of fact that there was no want of diligence on the part of the plaintiff, and that he, as a matter of fact, did not actually know of Ragan's misrepresentations prior to December 17, 1931, and probably did not know of them before May, 1932.

The plaintiff knew that there had been a breach of the contract in respect to the deposit of stock in a voting trust and, under the terms of the contract, might have sought a return of his money; but his failure to do so was prejudicial to no one but himself. Respecting ratification, the master found that the plaintiff did no act which amounted expressly or explicitly to a waiver or a ratification and did not, in fact, know of his right to rescind until after December 17.

### Conclusions of Law.

■ If it be assumed that the agreement of June 15 was valid and binding upon the parties, then, as I construe it, the plaintiff would be entitled to recover for breach of the Bank's undertaking to return the $300,000 in case of liquidation. The contract also expressly fixed the amount of the recovery at $300,-000 in case of any default on the part of the Bank. Such a default existed. The defendant, however, argues that payment to the Bank under the contract was a capital contribution and, therefore, subordinates plaintiff's rights to those of creditors. While it is quite apparent that a capital contribution was needed to fully meet the situation, the terms of the contract and the course pursued by the Bank probably did not effectuate that result.

■ Since both plaintiff and the receiver assail the validity of the contract, it is hardly necessary to reach a conclusion as to its legal effect. The receiver urges that the contract is invalid because ultra vires. This contention is sound. Several of the agreements undertaken by the Bank were beyond its corporate powers. I refer especially to those purporting to confer upon plaintiff power to name officers and directors. West v. Camden, 135 U. S. 507, 10 S. Ct. 838, 34 L. Ed. 254; Hellier v. Achorn et al., 255 Mass. 273, 151 N. E. 305, 45 A. L. R. 788; Creed v. Copps, 103 Vt. 164, 152 A. 369, 71 A. L. R.

1287; Sherman & Ellis v. Indiana Mutual Casualty Co. (C. C. A.) 41 F.(2d) 588; Sauerhering v. Rueping et al., 137 Wis. 407, 119 N. W. 184.

■ The plaintiff attacks the validity of the contract on the ground that it was induced by fraud or fraudulent representations and concealment of material facts. This contention, also, is valid. It is possible to find in the master's report all the necessary elements to establish a voidable transaction. False representations were made by Ragan of material facts, of knowledge which he did not have, and opinions which he did not hold. They were made with full knowledge of their falsity for the purpose of inducing the plaintiff to enter into the contract and part with $300,000. The plaintiff relied upon these misrepresentations, and in so doing acted with reasonable diligence and caution. It is settled law of contract that, where the party is induced to enter into a transaction with another party that he was under no duty to enter into, by means of the latter's fraud or material misrepresentation, the transaction is voidable. On this proposition no citations are necessary. I do not think it is seriously contested by the defendant.

■ If the only infirmities in the contract were its ultra vires provisions, the plaintiff would not be remediless. He could still disaffirm the contract and recover the money paid under the unlawful contract. Salt Lake City v. Hollister, 118 U. S. 256, 6 S. Ct. 1055, 30 L. Ed. 176; Central Transportation Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 S. Ct. 478, 488, 35 L. Ed. 55; Citizens' Central National Bank of N. Y. v. Appleton, 216 U. S. 196, 30 S. Ct. 364, 54 L. Ed. 443; Rankin, Rec'r, v. Emigh, 218 U. S. 27, 30 S. Ct. 672, 54 L. Ed. 915. See, also, Texas & Pacific Ry. Co. v. Pottorff, Rec'r, 291 U. S. 245, 54 S. Ct. 416, 78 L. Ed. 777.

In Central Transportation Co. v. Pullman's Palace-Car Co., supra, the court said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

I am unable to agree with the learned counsel for the defendant that the ultra vires provisions of the contract involved moral turpitude or were anything more than mala prohibita. Therefore, either party was at liberty to disaffirm the contract and recover money advanced under it. See Eastern Expanded Metal Co. v. Webb Granite & Const. Co., 195 Mass. 356, 81 N. E. 251, 11 Ann. Cas. 631.

■ It is argued that this rule would not apply inasmuch as some of the unlawful acts had been performed by the Bank, or at least the performance had been accepted by the plaintiff; in other words, the claim is that the contract, in order to be disaffirmed, must remain wholly unexecuted. Duane v. Merchants' Legal Stamp Co., 231 Mass. 113, 120 N. E. 370.

Apparently, in the cases that have been considered by the Supreme Court of the United States, the mere fact that the unlawful elements of the contract have been executed does not defeat the rights of a party to disaffirm and recover. See Citizens' Central National Bank v. Appleton, supra, and Rankin, Rec'r, v. Emigh, supra. It is of some importance that, in the case of Rankin, Rec'r, v. Emigh, supra, the suit was against the receiver of a national bank which had entered into an ultra vires contract.

Under the circumstances of the case at bar, it is my opinion that there is no room for the application of the rule that where parties have entered upon an illegal agreement, the law will leave them where it finds them, according to the maxim in pari delicto potior est conditio defenditis.

■ Moreover, the defense of ultra vires cannot be set up against a liability founded upon a fraud. First National Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750; Chesapeake & Ohio Ry. v. Howard, 178 U. S. 153, 20 S. Ct. 880, 44 L. Ed. 1015; Washington Gaslight Co. v. Lansden, 172 U. S. 534, 19 S. Ct. 296, 43 L. Ed. 543; Zinc Carbonate Co. v. First Nat. Bank of Shullsburg, 103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845.

■ In the instant case the contract is vitiated by fraud of which the plaintiff was the innocent victim. Where performance has been rendered, induced by fraud or misrepresentation, and the transaction is voidable, the injured party can have judgment for the value of the performance against any person to whom the performance has been rendered.

It is the contention of the defendant, however, that, even if this right of avoidance ever existed, that right has been lost by reason of laches, waiver, ratification, or failure to tender restitution.

It is said that the power has been lost because it is conditional upon an offer to return the amount of any money or other performance received. See Restatement of the Law of Contracts, § 480; Stuart v. Hayden (C. C. A.) 72 F. 402.

■ But the failure to return is not fatal to the plaintiff's claim because the performance rendered by the Bank consisted in obtaining resignations and proxies. This performance had become wholly worthless before the plaintiff first learned of his right to avoid. See Restatement of the Law of Contracts, § 480 (2) (a).

■ The Bank also credited interest upon the $300,000, but since this can be treated as money paid it can, if necessary to do equity, be credited in partial cancellation of the injured party's claim. See Restatement of the Law of Contracts, § 480 (2) (c).

■ The defendant contends further that the plaintiff cannot avoid the contract because of delay after he acquired knowledge of the misrepresentations. The findings of the master are opposed to the defendant's contention so far as it is a matter of fact. The several acts and omissions of the plaintiff and his agents, specified in the defendant's brief, would undoubtedly create in the mind of the plaintiff a suspicion respecting the wisdom and soundness of his investment; but these specifications do not bring home to the plaintiff or his representative knowledge of Ragan's perfidy. Knowledge that the investment is unsafe is not equivalent to knowledge of the fraud itself. MacNamee v. Bankers' Union for Foreign Commerce & Finance (C. C. A.) 25 F.(2d) 614, 618. The master has expressly found that it was not until after the Bank closed that the plaintiff first learned of his right to avoid the contract on the ground of false representation. As to the defendant's suggestion of ratification by the plaintiff, undoubtedly there were

acts done in the performance of the contract and pursuant to its terms, both by the officers of the Bank and by the plaintiff, but all of these acts were committed prior to the time when the plaintiff had knowledge or was chargeable with knowledge of Ragan's dishonesty. Laches involves an assumption that the party had knowledge of his rights, ample opportunity to enforce them, and a change of condition or relation during the period of delay. Galliher v. Cadwell, 145 U. S. 368, 372, 12 S. Ct. 873, 36 L. Ed. 738; Johnson v. Atlantic, Gulf & West India Transit Co., 156 U. S. 618, 15 S. Ct. 520, 39 L. Ed. 556.

The facts of the case at bar do not support these assumptions. The conclusions of the master respecting the defenses of laches, waiver, and ratification are abundantly sustained by the subsidiary facts found by him. They effectually negative defendant's contention that the plaintiff has lost his rights to avoid the transaction. Doujotos v. Leventhal, 271 Mass. 280, 171 N. E. 445, 69 A. L. R. 1080; Lincoln Investment Co. v. James, 260 Mass. 541, 157 N. E. 698; Powers v. Rittenberg, 270 Mass. 221, 169 N. E. 913.

■ It is undoubtedly a fact that must be considered that, after the $300,000 was paid into the Bank, deposits were received and new deposits obtained. It does not appear that any of these deposits were made upon the strength of the guaranty fund except as the fund enabled the Bank to go on with the approval of the examiner and comptroller, both of whom had full knowledge of the terms of the contract under which it was created. Obviously, since the plaintiff became aware of his rights to set aside the contract, there has been no change of situation prejudicial to other creditors of the Bank.

My conclusion, therefore, is that the plaintiff has not lost his rights to pursue the remedies of a defrauded party to a voidable contract, which remedy, as we have seen, is to recover for the value of his performance, which was at least $300,000.

■ The Bank was enriched at the expense of the plaintiff as a result of a voidable contract, and consequently the plaintiff is entitled to have his claim recognized. Whether he is to be treated as a general or a preferred creditor is one of the issues raised in this case which remains to be considered. In order to establish a preferred claim upon the assets in the hands of the receiver, it is necessary for plaintiff to show not only a trust relationship but an augmentation of

bank assets and a tracing of the fund representing the res into the hands of the receiver. The burden of proving these factors rests upon the plaintiff. Texas & Pacific Ry. v. Pottorff, supra, and note 19, page 261 of 291 U. S., 54 S. Ct. 416, 420. In that case the Bank pledged its assets to secure a depositor. The pledge was held invalid on the ground that it was ultra vires. The depositor nevertheless proved as a general creditor for the amount of its deposit. The court said that in the absence of an identified res and a constructive trust based on special circumstances of misconduct, no preference could be given to the depositor over other creditors. In the case at bar there was the special circumstance of misconduct which might give rise to a constructive trust. Considerable doubt may be entertained whether there was in this case an augmentation of the Bank's assets, especially if we give effect to the issuance of a certificate of deposit, the result of which would be to create a liability coextensive with the amount paid in by the plaintiff. However this may be, the plaintiff has not sustained his burden of identifying the trust res. He traces it into a special account carried by the Bank in the Federal Reserve Bank. This special account was constantly undergoing changes, owing to deposits and withdrawals. For a greater part of the time up to December 14, there was more than $300,000 in this fund. Occasionally it went below that amount. The lowest point reached prior to that date was $273,638. On December 15 it had been reduced to $259,185, and on December 16 the fund was completely exhausted and overdrawn to the extent of $22,645.

The master finds quite properly that at the close of business on December 16, no part of the $300,000 paid in by the plaintiff in June remained in the Reserve Account of the Federal Reserve Bank. The master also found that on December 16 the Federal Reserve Bank had items received from the Bank aggregating $177,775, which were carried in an uncollected account. We have seen that the practice of the Bank was to credit these items in the Reserve Account as and when they were collected, or at least after a sufficient time had elapsed for the collection. These items were subsequently transferred to the Reserve Account until it eventually grew to more than $161,500.

■ It is the contention of the plaintiff that inasmuch as these items carried in the uncollected account were checks, indorsed without restriction, the Federal Reserve Bank

became the owner of such checks; that the distinction between the "uncollected account" and the "reserve account" was not a substantial one and had been adopted solely for the convenience of the Bank.

Conceding this contention to be sound, it does not help the plaintiff in tracing the funds into the hands of the receiver. The question is not whether the Federal Reserve Bank was or was not the owner of the uncollected items. Where one who stands in the position of a trustee mingles the trust res with his other funds, the law will presume that all withdrawals from the mingled account were first withdrawals against his own money, rather than against the trust fund. Blumenfeld v. Union National Bank of Beloit, Kan. (C. C. A.) 38 F.(2d) 455; Dickson v. First National Bank of Buffalo, Okl. (C. C. A.) 26 F.(2d) 411; Fiman v. State of South Dakota (C. C. A.) 29 F.(2d) 776.

When the commingled funds are completely exhausted, that presumption does not hold. The evidence places the $300,000 in the Reserve Fund, and it would be presumed that there it remained, in whole or in part, as long as there was any balance in that fund. According to my view of the applicable law, the plaintiff is not helped by the fact that the Federal Reserve Bank had uncollected items in another account. This court has had occasion to consider, in another case, the rights of a plaintiff to trace the proceeds of a collection into the same special account of the Federal Reserve Bank, and in that case held that, since the special fund was completely dissipated, all trace was lost and that the trust could not be impressed upon subsequent accumulations in the fund. Colorado Milling & Elevator Co. v. Cunningham (D. C.) 7 F. Supp. 965. It appears further, in the case at bar, that the subsequently accumulated special fund never reached the hands of the receiver because it was applied with the proceeds of liquidated securities to the satisfaction of the Bank's indebtedness to the Federal Reserve Bank. It did, however, free from any pledge certain collateral which was turned back to the receiver. It is the plaintiff's contention that this exoneration entitled the plaintiff to impress the trust upon other funds in the hands of the receiver. In the Colorado Milling & Elevator Co. Case, I refused to extend the equitable right to follow misapplied funds as far as this contention would require.

The plaintiff has also argued that he should be allowed to impress the trust upon assets in the hands of the receiver, at least, to the extent of $295,000, the face value of bonds purchased and paid for out of the special deposit in the Federal Reserve Bank. The difficulty with this argument is that the bonds were subsequently hypothecated with the Federal Reserve Bank as collateral security and were later sold and the proceeds applied on indebtedness of the Bank to the Federal Reserve Bank. These bonds were paid for originally with money borrowed from the Federal Reserve Bank, and the borrowed money was paid back to the Federal Reserve Bank from time to time in relatively small amounts. It would be presumed, if the balance in the Reserve Account was in excess of $300,000 when the Bank drew upon the Reserve Account for these amounts, that the trust res was not used for the purchase of these bonds.

It follows from the foregoing that the plaintiff is entitled to prove for his $300,000 as a general creditor, and a decree may be entered accordingly.