**In re CARDON REALTY CORP., Debtor.**

**Bankruptcy No. 87–10054 K.**

United States Bankruptcy Court,
W.D. New York.

Sept. 9, 1994.

183

Michael J. Russo, Damon & Morey, Buffalo, NY, Elizabeth Roberto, Eames, Wilcox, Mastej, Bryant, Swift & Riddell, Detroit, MI, for Trucking Employees North Jersey Welfare Fund.

Arthur L. Porter, Jr., Fischer, Weisinger & Caliguire, Englewood Cliffs, NJ, for debtor.

Harvey S. Mars, Gleason & Mathews, New York City, for Management Labor Pension Fund Local 1730.

Jerry M. Cutler, Abato, Rubenstein and Abato, P.A., Baltimore, MD, for Freight Drivers and Helpers Local Union No. 557 Pension Fund.

Herman P. Loonsk, Saperston & Day, Richard L. Mugel, Cohen, Swados, Wright, Hanifin, Bradford & Brett, Buffalo, NY, for trustee.

William E. Lawson, trustee, Buffalo, NY.

MICHAEL J. KAPLAN, Chief Judge.

Before the Court are matters under 11 U.S.C. § 502(b). They are objections to three claims, totalling over $600,000, which were filed against the estate of this Chapter 7 Debtor, Cardon Realty Corporation. The claims have been filed by three Pension Funds seeking the unpaid balance of pension plan withdrawal liability under the "Multi-employer Pension Plan Amendments Act of 1980" ("MPPAA"), which Amendments modified the Employee Retirement Income Security Act (ERISA).[1] As described in one of the Pension Fund's briefs:

> MPPAA was enacted to require that a contributing employer withdrawing from a multi-employer pension plan pay withdrawal liability, which is its proportionate share of the plan's unfunded vested benefits. See 29 U.S.C. § 1381. However, Congress did not limit responsibility for withdrawal liability to the withdrawing employer alone, but extended it to the employer's affiliated businesses as well. MPPAA provides that trades and businesses under common control shall be treated as a single, unified employer, 29 U.S.C. § 1301(b)(1) thus making all members of the controlled group jointly and severally liable for the withdrawal liability incurred by anyone of them. *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1372 (7th Cir. 1992).[2]

This Debtor has been found to be a member of a single "controlled group" which included the now-defunct Dorns Transportation, Inc. and also Oneida Motor Freight, among other entities. Dorns ceased doing business in 1981, and Oneida became a Chapter 11 debtor in 1985. Two of the claims presently disputed were claims for pension plan withdrawal liability occasioned by Dorns' withdrawal, and another disputed claim arises out of Oneida's withdrawal.

The objections have been filed by the Debtor corporation, which is controlled by Donald Singleton and Carrie Singleton: "Cardon" stands for "*Car*rie" and "*Don*ald," according to Donald Singleton's testimony in the Oneida case. The Chapter 7 Trustee has joined in the objections. Two other Pension Funds commenced the present Chapter 7 proceeding against Cardon by filing an involuntary bankruptcy petition against Cardon on January 12, 1987. These Pension Funds[3] have been silent other than through the Trustee, but they could be presumed to agree with the Debtor that they are the only Pension Funds that have properly established their rights against this particular Debtor, and to argue, consequently, that the assets of this bankruptcy estate must be distributed only to those two Pension Funds, and that the claims of the other Funds must be disallowed. The only known asset of this bankruptcy estate is a judgment possessed by the Chapter 7 Trustee against the Singletons personally in the aggregate amount of $1.6288 million.[4] The Singletons and those two Funds appear to be of one accord because although those two Funds have apparently preserved their rights against the Singletons personally, and the other Funds might not have preserved their rights against the Singletons, and although participation by the other Funds in a distribution of the limited assets of this estate will increase the

1. ERISA is found at 29 U.S.C. § 1001 et sequitur. MPPAA is a portion thereof, codified at 29 U.S.C. §§ 1381–1453.

2. "Claimant Management–Labor Pension Fund Local 1730, ILA's Memorandum of Law in Opposition to Debtor's Motion to Disallow Discharge Claimant's Proof of Claim," filed July 18, 1994, page 1.

3. The New England Teamsters and Trucking Industry Fund and the Teamsters Pension Fund of Philadelphia and Vicinity. Although there is sporadic reference to a "New York Fund" in the papers, the docket seems silent as to any such Fund.

4. It resulted from the Trustee's prosecution of fraudulent transfer claims arising out of the Singleton's sale of assets of Cardon for their use in, *inter alia*, settling their personal obligations to the Oneida bankruptcy estate. Cardon's argument that $700,000 went to "fund" the Oneida Plan is a charade. The $700,000 went to the Singletons for their own use in satisfying their personal liability to Oneida. Cardon owed nothing to Oneida. To the extent, however, that any fund has failed to reduce their claims by the amounts paid by Oneida, by the Singletons, or by any other source, the claims must be amended.

remaining exposure of the Singletons to the Philadelphia and New England Funds, the Singletons' resources are not limitless and the increased direct liability from them to the Philadelphia and New England Funds might not be collectible.

Of record, there are no creditors of this bankruptcy estate other than the various Pension Funds. The filed claims are substantially in excess of the face amount of the judgment which the Trustee has obtained against the Singletons; consequently, the extent of each claimant's recovery depends upon the allowability of the claims of others. The disputed claims are as follows. The Trucking Company of North Jersey Welfare Fund ("TENJ") has filed a proof of claim for $140,131.00 against Cardon for the balance of the amount owed upon the withdrawal liability assessed against Oneida/Dorns in 1981. The Management and Labor Pension Fund Local 1730 ("Local 1730") has filed a claim in the amount of $197,981.00 also arising out of the 1981 withdrawal of Dorns. The Freight Drivers and Helpers Local 557 Pension Fund ("Local 557"), on the other hand, arose out of the 1985 withdrawal of Oneida, and it has filed a claim in this case for $374,071.00.

The Debtor asserts that these claims should be disallowed under 11 U.S.C. § 502(b)(1) on the grounds that they are not enforceable against the Debtor. The Debtor claims that the notice and demand requirements of MPPAA were never complied with by Locals 557 and 1730 as pertains to Cardon Realty; that the claims filed by those Funds in this bankruptcy proceeding are untimely under applicable non-bankruptcy law, and that those Funds are precluded from asserting these claims by laches.

As to the TENJ claim (also referred to as the "North Jersey claim"), the Debtor asserts that there has never been "adequate notice" to Cardon, that the claim is barred by laches, and that TENJ's acceptance of certain escrow fund monies constituted an "accord and satisfaction" requiring the discharge of the claim.

5. There has been no evidentiary hearing in the present context. The facts recited here seem to be common to the recitations submitted by the

In the alternative, Cardon argues that it and the Trustee are entitled to arbitrate the alleged claims, subject to this Court's review.

## DISCUSSION

Since the enactment of MPPAA in 1980, that statute has evolved dramatically. Initially, employers affected by it might, in good faith, have thought that it was unconstitutional; or that each entity sought to be held liable as a member of a controlled group had to be separately served with notice of a claim of withdrawal liability; and that each entity thus served could independently challenge (at the time of such service) the size of the liability in light of facts that underlie the payroll records, actuarial tables and other information upon which the liabilities were computed; and that it was incumbent upon the Pension Funds to quickly investigate, explore, and ferret out each entity that might be held liable for underfunding. Employers and owners might have had what I will call a "restrictive view" of the reach of the statute at the time the statute was enacted.

Pension Funds, on the other hand, initially had an "expansive view" of the statute's reach. They believed that notice of liability to one entity within the controlled group would constitute notice to all entities in the group; that any entity that wished to challenge the liability must do so within a specified number of days after the initial notice to any member thereof, or be thereafter foreclosed from challenging the liability; and that every member of the controlled group must step forward at the outset and identify itself as such, and must assure that the liability will be paid by at least some member of the group.

Consistent with the "restrictive view," the Singletons and others undertook (it seems)[5] a series of activities to challenge or evade the Pension Fund trustees, beginning in 1981 or 1982. Cardon's existence was not quickly disclosed.[6] Rather, Oneida/Dorns challenged

parties and seem to be without significant dispute.

6. Cardon was one of a number of related corporations that owned the various terminals from

the constitutionality of the statute as soon as the assessment of the liability against Dorns was made in 1981. (Dorns was at the time related to Oneida.) The Singletons caused Dorns/Oneida to challenge the dollar amount of some claims, but did not announce Cardon's existence or cause Cardon to challenge any claims. When Oneida filed bankruptcy in 1985, the Singletons (and perhaps other controlling persons) did not cause Oneida to schedule Cardon in the case as a co-obligor as to the Pension Funds' claims against Oneida. Had they done so, the world (and, more particularly, all of the Pension Funds) would have been on notice of the existence of Cardon and could have pursued Cardon at that time, even into involuntary bankruptcy if necessary. Furthermore, if there was a right of contribution or indemnity on behalf of Cardon against Oneida or other affiliated entities (there were several other valuable corporations owned by Singleton family members or interests), Cardon should have been scheduled in the Oneida bankruptcy as a contingent *creditor of Oneida,* and *creditors of Cardon* —whether they were only the Pension Funds, or the Pension Funds and innocent third party creditors with no knowledge of Cardon's membership in a controlled group—*could have insisted* (by means of involuntary bankruptcy if necessary) *upon the pursuit of Cardon's claims* for contribution or indemnity against Oneida and any other entities. (Some of those entities might have been solvent at the time.) [7]

Again, consistent with the restrictive view of the statute's reach, when the Singletons and the Creditors' Committee in the Oneida

case reached a settlement of Oneida's possible claims against the Singletons personally, the Singletons treated Cardon as their own asset to liquidate: Cardon had not been served with a separate demand and might have been solvent were the pension claims not enforceable against Cardon for any reason, so they took more than a million dollars in value from Cardon, of which over $700,000 was supposedly used to fulfill their personal obligations to Oneida under the settlement. When the present involuntary petition was filed in 1987, they continued to argue the restrictive view. They argued that the various Funds were not creditors of Cardon, and they would not include the Funds in the schedule of creditors, until they were ordered to do so just this year (7 years after the involuntary petition) after vigorous protests and an appeal.

But during the fourteen years that they have consistently acted and relied upon their faith in that view, the legal basis for such reliance has gradually but substantially been eroded. MPPAA has withstood repeated constitutional attack.[8] Each of three times that a U.S. Circuit Court of Appeals has considered the question of "notice," they have ruled that notice to one member of a controlled group constitutes notice to every member.[9] (The present Court's own Circuit Court, the Second Circuit Court of Appeals, has not considered the issue). And the failure to timely arbitrate has been held to foreclose the ability to contest liability on amount,[10] even when it is a bankrupt, *this* bankrupt, that is seeking to challenge liabili-

which Oneida/Dorns operated its trucking business.

7. If the MPPAA liability of Cardon rendered Cardon insolvent, then the Singletons' were required to administer Cardon's affairs as fiduciaries for the benefit of Cardon's creditors. See this Court's decision in *In re Albion Disposal,* 152 B.R. 794 (Bankr.W.D.N.Y.1993).

8. See, for example, *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust For Southern California,* — U.S. —, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connelly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); and

*Dorn's Transport, Inc. v. I.A.M. National Pension Fund,* 578 F.Supp. 1222 (D.D.C.1984), aff'd without opinion 753 F.2d 166 (D.C.Cir.1985).

9. *Trustees of the Amalgamated Insurance Fund v. Sheldon Hall Clothing, Inc.,* 862 F.2d 1020 (3rd Cir.1988); *Teamsters Pension Trust Fund v. Allyn Transportation Company,* 832 F.2d 502 (9th Cir. 1987); *IUE AFL–CIO Pension Fund v. Barker and Williamson, Inc.,* 788 F.2d 118 (3rd Cir.1986).

10. *New York State Teamsters Pension Fund v. McNicholas Transportation Company,* 848 F.2d 20 (2nd Cir.1988); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258 (2d Cir. 1990).

ty and amount.[11]

### Notice to One is Notice to All

█ Bearing the torch of the "restrictive view" to its bitter end, the Debtor asks this Court to reject the reasoning of the numerous courts, including the three decisions of two circuits cited above, to the effect that notice to one member of a controlled group is notice to all. I am persuaded, however, by the case of *IUE AFL–CIO Pension Fund v. Barker and Williamson*, 788 F.2d 118 (3rd Cir.1986) that the rule is as those courts enunciate.[12]

I find that the notice given to Dorns and/or Oneida constituted notice to Cardon Realty Corporation, and that Cardon was required to seek arbitration within the time that those entities had in which to make that demand, or be barred. Cardon is barred.

### The Statute of Limitations

█ In the Pension Plans' assertions of their claims under MPPAA, it is not enough that proper notice be given to the controlled group. Once the notice and demand are dishonored, then any civil action with respect to a multi-employer plan is governed by the Statute of Limitations contained in 29 U.S.C. § 1451(f), which provides:

An action under this section may not be brought after the later of—

(1) Six years after the date on which the cause of action arose, or

(2) Three years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the

case of fraud or concealment, such action may be brought not later than six years after the date of discovery of the existence of such cause of action.

It is well understood that a cause of action under MPPAA arises when the employer defaults on payments under the post-withdrawal schedule of withdrawal liability payments.[13]

This Court holds that the Debtor's argument to the contrary is in error; it is not true that the Statute of Limitations begins to run when the employer ceases making contributions to the original plan or otherwise withdraws in whole or in part from that Plan.

Local 1730, consequently, correctly claims that the Statute of Limitations began as to its claim on or about October 1, 1982, when Dorns failed to make its first scheduled payment.[14] The TENJ claim might conceivably be viewed to have arisen as early as September or November of 1981 when TENJ gave notice to Dorns of its demand for payment. However, Dorns and Oneida then sued TENJ and obtained, on January 15, 1982, an Order of the United States District Court for the District of New Jersey by which TENJ was "restrained and enjoined from further prosecution of its withdrawal liability claim under the procedures set forth in MPPAA pending a determination of the constitutional issues raised by [Dorns and Oneida] or until further order of the Court. . . ." According to TENJ, the union was enjoined from that date until early in 1988 from bringing suit against Cardon.[15] As explained by TENJ,[16]

---

**11.** *In re Cardone [sic] Realty v. Teamster Pension Fund of Philadelphia and Vicinity*, 99 B.R. 202 (W.D.N.Y. 1989).

**12.** In *Trustees of the Amalgamated Insurance Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020 (3rd Cir.1988) and in *Teamsters Pension Fund v. Allyn Transportation Company*, 832 F.2d 502 (9th Cir.1987), a different panel of the 3rd Circuit and a panel of the 9th Circuit, respectively, were similarly persuaded by the reasoning of the *Barker and Williamson* case.

**13.** *Central States Pension Fund v. Navco*, 3 F.3d 167 (7th Cir.1993), which decision additionally holds that that date governs for Statute of Limi-

tations purposes, and not any later date on which the pension fund ascertains the identity of a particular controlled-group member that it seeks to hold liable.

**14.** See page 14 of its Memorandum filed July 18, 1994.

**15.** The present Court believes that if TENJ had known of Cardon, it could have (and perhaps should have) petitioned the New Jersey District Court for relief to pursue Cardon.

**16.** See its "Response to Singletons' Letter Brief in Support of Objection to Claim," filed February 14, 1994, page 7.

By January, 1987 the two petitioning creditors, Philadelphia Vicinity Teamsters Fund and New England Teamsters Fund had placed Cardon Realty in involuntary bankruptcy. Thus, even if TENJ had known of the existence of Cardon, it could not have taken any action until after the disputed bankruptcy filing. However, TENJ was unaware of the bankruptcy since it received no notice. TENJ filed its claim in March, 1993, after it learned of Cardon's status as a controlled group member and after it learned of the bankruptcy. The proof of claim was filed five (5) years after the injunction was lifted, within the six-year Statute of Limitations of MPPAA.

The involuntary petition in this case was filed on January 12, 1987. Consequently, if the cause of action on behalf of TENJ did not arise until the fall of 1981, and if (as discussed later) 11 U.S.C. § 108(c) tolled the Statute of Limitations as of the filing of the voluntary petition, then the issue of the restraining order is irrelevant. (In fact, the parties seem to agree that the cause of action arose much later, when escrow proceeds were distributed, as discussed later.)

Local 557's claim, unlike the claims of Local 1730 and TENJ, arose out of the filing of the Oneida bankruptcy in 1985, not out of the cessation of Dorns' business in 1981. The notice was sent to Oneida on August 8, 1985. Consequently, if Section 108 of the Bankruptcy Code operates as described above, the 1987 involuntary petition against Cardon began tolling the six year Statute of Limitations years before the expiration of that limitation.

■ Because this Court has ruled that (in the absence of laches; see below) the cause of action accrues, at the earliest, when the employer's withdrawal liability payments become overdue, these three proofs of claims are not subject to disallowance on Statute of Limitations grounds, provided that the Statute of Limitations has been tolled since the filing of the involuntary petition by operation of 11 U.S.C. § 108(c).

The Debtor ignores 11 U.S.C. § 108 entirely in its arguments in support of its view

that the pertinent limitations periods expired no later than sometime in 1991. The Debtor seems to believe that the pendency of the bankruptcy case is irrelevant to the running of the Statute of Limitations and that the Funds were required to assert their claims as if section 108 did not exist even though the Debtor elected not to schedule the Funds as creditors; and even though the Funds, consequently, did not receive notice from the Court of the pendency of the bankruptcy; and even though the law is that even if the Funds had knowledge thereof, they were not required to assert their claims because no date had been set for the filing of proofs of claim in the case until this Court's order of February 24, 1994 fixing a claims bar date of April 12, 1994.

The language of the Statute is clear, and the Court holds that because the Statute of Limitations had not run prior to the filing of the involuntary petition, and because the automatic stay is still in effect as to these claimants' rights against the Debtor's estate, then the Statute of Limitations has never lapsed as to these claims even to this day. If the claims are to be disallowed under 11 U.S.C. § 502, it must be on grounds other than an assertion that they are unenforceable against the Debtor by reason of expiration of the Statute of Limitations.

### Laches

■ The Debtor argues that the Doctrine of Laches precludes the Pension Funds from asserting their claims.

■ This Court has no quarrel with the view that laches might preclude enforcement of a claim before the expiration of a Statute of Limitations if it is not clear that a statutory limitations period applies to the action or if the limitations period is being applied to an equitable or legal remedy *only* by way of analogy.[17] This Court has great difficulty, however, accepting the proposition that "Laches and the Statute of Limitations are mutually exclusive, even when the statute has been made specifically applicable to the

---

17. See 27 Am.Jur.2d, Equity § 160.

claim and the claim was brought within the statutory period." [18]

Nonetheless, assuming for the sake of argument that laches could apply, the present Court rejects the application of the doctrine to bar the claims in the case at bar. The Debtor correctly cites only the first part of the rule governing laches; it omits the critical second part. The first part, as stated in the case of *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674 (Bankr.S.D.N.Y. 1993) is that:

> In the Second Circuit, the Laches Doctrine considers the following factors: (1) proof of delay in asserting a claim despite the opportunity to do so, (2) lack of knowledge on the defendant's part that a claim would be asserted, and (3) prejudice to the defendant by the allowance of the claim. *Rapf v. Suffolk County of New York*, 755 F.2d 282, 292 (2d Cir.1985).

■ But the second part is contained in the *Rapf* case itself wherein the Second Circuit Court of Appeals stated that "[I]n order to show that he has been prejudiced, a *defendant* must show reliance and change of position *resulting from the delay*." [19]

That the Singletons may be prejudiced by allowing the Funds' claims is not relevant to the Court's determination because the Singletons are not the "defendants" here. The claims asserted by the Funds are claims against the bankruptcy estate of Cardon Realty, and so long as the estate of Cardon Realty is merely a fixed amount of dollars, the estate cannot be prejudiced by anything this Court might say about how the funds are to be distributed. It is true that the Court must be concerned with the interests of the two Funds that filed the involuntary petition, as they are beneficiaries of this Debtor's estate. While it may be argued that those Funds would be prejudiced by the allowance of the three claims at issue, this Court cannot see how any such prejudice might be the result of the three Funds' lack of diligence. The Philadelphia Fund and the New England Fund, which filed the involuntary petition against Cardon, have not been shown to have done anything at all in reliance upon inaction by the other Funds. As of 1987 when they filed the involuntary petition against Cardon, they had done only what was diligent, regardless of the actions of other Funds. Furthermore, that there may be a larger number of valid claims against the estate than they heretofore believed is to them a major "disappointment" (as noted by Local 1730), but not prejudice.

Again, as to the Singletons, this Court is aware of no interpretation of the Doctrine of Laches by which an action by one party against another party should be dismissed because of prejudice to a non-party, unless that non-party is an "innocent [third] party." [20] The Singletons should have caused Cardon to be listed as a co-obligor in the Oneida bankruptcy in 1985 and they should have scheduled the Funds as creditors in this involuntary bankruptcy filed against Cardon

---

18. *In re Centric Corporation*, 901 F.2d 1514 (10th Cir.1990), which cited, for that proposition, the case of *Armstrong v. Maple Leaf Apartments Limited*, 622 F.2d 466 (10th Cir.1979). To the present Court's view, the *Armstrong* case did not stand for that proposition. Rather, that case involved the interpretation and application of State Law Doctrines of Limitations and Laches to a federally created cause of action. The present Court doubts that it may apply the equitable Doctrine of Laches to a MPPAA cause of action in such a manner as to nullify the express command of Congress granting a six-year Statute of Limitations: compare, however, *ILGWU National Retirement Fund v. Levy Brothers Frocks*, 846 F.2d 879 (2d Cir.1988) in which the Court stated that the MPPAA action before it "was commenced well within the six-year Statute of Limitations under 29 U.S.C. § 1451(f), and in light of the complexity of the tasks imposed on the Fund under the Statute and Congress' clear intention to help the plans collect withdrawal liability, we cannot say that appellants' delay was so unreasonable as to support a defense of laches." This language might suggest the Second Circuit was not prepared to rule out the possibility that a MPPAA action commenced within the Statute of Limitations might nonetheless be dismissed for equitable reasons. It has been offered by the Funds, however, that the Circuit was referring to time before the Notice of Withdrawal Liability was served by the Funds there in question, not to the six years between the Notice and a civil action.

19. *Rapf* at 292.

20. *Johnson v. Atlantic, Gulf and West India Transit Company*, 156 U.S. 618, 15 S.Ct. 520, 39 L.Ed. 556 (1895).

in 1987. The Singletons are not in a position to complain of their change in position between 1987 and the present day (if not between 1985 and the present day). It is disingenuous of them to do so. If laches did not already foreclose these claims in 1987, then it does not foreclose these claims now, and as of 1987 there had been no change in position either by the Singletons or by the petitioning involuntary creditors that was a result of a lack of diligence or of inaction by the claimants presently before the Bar.

### Accord and Satisfaction, and Waiver

■ The Debtor argues that TENJ "impliedly agreed to accept only monies from the [Oneida] bankruptcy in satisfaction of its claim against [Oneida] and members of its common control group,"[21] when TENJ accepted monies from an escrow account that had been established in connection with Oneida and Dorns' lawsuit against TENJ attacking the constitutionality of MPPAA, and when TENJ additionally accepted a distribution of funds from Oneida. This argument attempts to charge TENJ with constructive knowledge of the existence of Cardon and of Cardon's relationship to Oneida, because Donald Singleton had disclosed the existence of Cardon to the Oneida creditors' committee in an examination under oath under Bankruptcy Rule 2004 in the Oneida case in 1985. It is an effort to obtain a ruling that the Singletons, when speaking as the controlling persons of Oneida in Oneida's bankruptcy were in some fashion acting as agents of Cardon and that those persons interacting with Oneida as a Debtor-in-Possession were chargeable with an intent to be bound as to Cardon, by means of Oneida's actions. The Court knows of no theory of law to support such construction. Among other defects, it treats "capacity" and "separate entities" as legal nullities.

Only if there had been either (1) a "due diligence" obligation, or (2) actual knowledge of the existence of Cardon and demonstrable intent to release it, could such arguments hold water.

Similarly, the Debtor's assertions that the other Funds have waived their claims must fail, as must the Debtor's argument that TENJ is estopped by a 1988 letter to the attorneys for Oneida to the effect that TENJ "has not alleged" liability against any companies other than Dorns/Oneida. These arguments reach far beyond the limits of "knowledge," "capacity," "separate entity" and other applicable legal concepts.

### Recomputation of Liability

The Debtor asserts a right to seek review of the calculation—to challenge the withdrawal liability determination—either in this Court, or through arbitration that would be subject to this Court's review. The Trustee, in the same vein, argues that the "substance" of the Funds' claims is not yet properly before the Court. He wishes to preserve his right to examine the substance of the claim— e.g. whether it was computed properly, and the accuracy of the actuarial tables upon which it is based—and to raise an objection later, if appropriate.

The Debtor's arguments are based on (1) what it believes to be grounds for an equitable tolling of the time within which arbitration may be sought under MPPAA, or, in the alternative, (2) the authority of a Bankruptcy Court to engage in a substantive review of the claims.

■ As to equitable tolling, it is ably noted in the supplemental letter-brief filed on behalf of Local 1730 that Dorns'/Oneida's early experience with MPPAA, by which it immediately challenged the law upon TENJ's assertion of withdrawal liability, and obtained a consensual order restraining TENJ from enforcing its rights under MPPAA during the litigation, proves that the Singletons knew the proper procedures by which Cardon could have prevented a waiver and default of its rights to seek review. Furthermore, the "restrictive" view of the reach of the statute had been unravelling in courts as early as 1982, including a 1984 United States Supreme Court Decision upholding the constitutionality of the statute (*Pension Benefit Guaranty Corp. v. R.A. Gray & Company,*

---

21. Debtor's letter-brief, at 19, filed Jan. 27, 1994.

467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). By 1985, there was a clear and unambiguous holding that notice to a single controlled group member is sufficient to bind all (*Connors v. Calvert Development Company,* 622 F.Supp. 877 (D.D.C.1985)), and that decision was rendered before the expiration of Cardon's opportunity to contest Local 1730's assessment of withdrawal liability in the context of its claims in the Oneida bankruptcy.

As set forth in the supplemental letter-brief by Local 1730, "if [Cardon] ignored the statute with the hope that at some future point in time it would be pronounced unconstitutional, Cardon ran the risk of waiving whatever rights it may have had.... Having chosen to roll the judicial dice, Debtor cannot invoke equity to save it from the consequences."

Assuming, for the sake of argument, that this Court has discretion to grant an equitable tolling of the period within which Cardon may seek arbitration of the Fund's claims, the Court finds from the above that the equities do not favor such tolling.

■ As to the assertion that this Court may review the claims pursuant to the general authority of the Bankruptcy Courts, the Court again observes that if these claims are inflated, but are beyond review, then creditors of Cardon have been injured by the Singletons' reliance on the restrictive view of the reach of the statute. Had the Singletons caused Cardon to step forward when Oneida/Dorns was assessed, the creditors of Cardon could have been protected against an improperly calculated assessment. The binding effect of default has been well settled in this circuit, outside the context of bankruptcy cases [22] and it is not unusual for prepetition defaults by the Debtor to have adverse, but nonetheless binding, consequences in bankruptcy, for the Debtor's creditors. Consider, for example, *Kelleran v. Andrijevic,* 825 F.2d 692 (2d Cir.1987), establishing that this Court may not look behind a State Court's grant of a default judgment in determining the allowability of a claim, in the absence of fraud or

collusion. And as 11 U.S.C. § 108 contemplates, creditors might be at a loss for the Debtor's pre-petition failure to assert an insurance claim, for example, in a timely fashion. If inaction or inattentiveness by a debtor does not at some point bind its creditors, then an involuntary bankruptcy filing would itself not be a "time-limited" remedy; rather, involuntary bankruptcy would become the "solution" to long-final resolutions suffered by a debtor. No such corruption of notions of "finality" should be read into the powers inherent in the claims allowance process.

While I agree with the Trustee that it was in a different setting that the District Court decision earlier in the present case, quoted with approval the previous Bankruptcy Judge's finding "that it is perfectly appropriate in the context of an involuntary petition to bind the Debtor with the effects of a procedural default, which concededly occurred in this case, and that was namely this Debtor's failure to seek arbitration on the issue of the amount of its alleged liability," (*Cardone* at 205), it is nonetheless clear that the result is not different here. It is not "law of the case" that requires a ruling in favor of the Funds here, but rather it is the sound principle that where, as here, Congress has established the method of fixing a claim, and that claim has become fixed in accordance with that method, then neither the Debtor nor its creditors can acquire greater rights by a filing of bankruptcy. Assuming for the sake of argument that the claims are excessive, then any injury to other claimants here is not the fault of the law nor the fault of the claimants; rather it is the fault of those who failed to face the realities of a crumbling "view," and failed to perform their duty to protect the creditors of their various enterprises.

### Conclusion

I have considered all other arguments raised by the Debtor and Trustee and find them to be without merit. The objections to the claims of TENJ, Local 1730 and Local 557 are rejected in their entirety, except that any claim that fails to take account of previ-

---

**22.** *New York Teamsters Pension Fund v. McNicholas Transportation Company,* 848 F.2d 20 (2d Cir.1988); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258 (2d Cir.1990).

ous payments must be amended (see footnote n. 4, above).[23]

SO ORDERED.

---

**23.** It might seem that this result flies in the face of the holding that 6 years is ample time for a diligent fund to discover the identity of the members of the controlled group. (See footnote 13 above). After all, the effect of the Singletons' failure to equip the Court to notify these funds was to artificially create a circumstance, from the funds view, identical to there having been no bankruptcy filing—the funds did not bring action within 6 years.

Why, then, should § 108 give them a "free ride" from 1987 to 1994? The answer is that that is what bankruptcy is for. Here, the New England and Philadelphia Funds invoked the process. They knew that in so doing they would have to share ratably with other funds who filed timely proofs of claims. Although it was their diligence that save these other funds from a time bar, they have not complained here of any prejudice.

The result would have been no different had Cardon filed bankruptcy voluntarily, or had it been a non-MPPAA creditor who filed the involuntary petition. Cardon might have filed voluntarily in order to achieve an orderly liquidation. A non-MPPAA creditor might have filed an involuntary petition against Cardon if MPPAA claimants were receiving preferential payments from Cardon.

These are what bankruptcies are all about, and the tolling wrought by § 108 is a critical part of it. That these claimants fare better here than they would have but for the bankruptcy filing (because they would have been time-barred outside bankruptcy) is not inequitable, prejudicial, inadvertent or untoward. It is an incident of bankruptcy's roots in orderliness and in emphasizing equality of distribution over the "race to the courthouse."